UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LAKELAND EMPLOYEES PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BAXTER INTERNATIONAL INC., ROBERT L. PARKINSON, JR., ROBERT M. DAVIS and NORBERT G. RIEDEL, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Baxter International Inc. ("Baxter" or the "Company") between September 17, 2009 and May 3, 2010, inclusive (the "Class Period"), against Baxter and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Baxter, through its subsidiaries, develops, manufactures and markets products for people with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions.  The Company's products are used by hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices, clinical and medical research laboratories, and by patients at home under physician supervision.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's plasma-derivative products business.  Notwithstanding changes in the industry that would inhibit Baxter's growth, defendants assured investors that the Company's recent improvements in gross margin were not only sustainable but could even expand.  Defendants further issued materially false and misleading statements regarding the remediation of the Company's COLLEAGUE infusion pump ("COLLEAGUE pump").  Specifically, defendants failed to disclose that Baxter was not complying with the terms of a June 2006 consent decree it had entered into with the U.S. Food and Drug Administration ("FDA").  As a result of defendants' false and misleading statements about the Company's growth and products, Baxter stock traded at artificially inflated prices during the Class Period, reaching a high of $61.71 per share on January 14, 2010.

4.      On April 22, 2010, the Company reported its first quarter 2010 financial results, lowering its revenue and earnings outlook for 2010.  Baxter disclosed that due to continuing pressures in its critical plasma-derivative products business, including a loss in market share, as well as the impact of healthcare reform legislation, it was reducing its revenue guidance for 2010 to

revenue growth in the range of 1% to 3%, down from a previous range of 5% to 7%. Specifically, the Company disclosed it was reducing its revenue guidance for its plasma-derivative products from growth in the mid- to high-single-digit range to a decline in the mid-single-digit range and it was reducing its revenue guidance for its antibody therapy products from growth in the mid-single-digit range to a decline in the 10% to 15% range.

5.　　On this news, Baxter's stock collapsed $7.82 per share to close at $51.13 per share on April 22, 2010, a one-day decline of over 13%, on volume of more than 50 million shares, or over 13 times the average three-month daily volume, as artificial inflation came out of the stock price. This was the largest one-day decline in the Company's stock price in over seven years.

6.　　Then, on May 3, 2010, Baxter announced that the FDA had ordered the Company to recall its COLLEAGUE pumps pursuant to its June 2006 consent decree. In response, the FDA issued its own release concerning Baxter's recall, indicating the action was necessary due to the Company's "longstanding failure to correct many serious problems with the pumps."

7.　　On this news, Baxter's stock declined $2.42 per share to close at $45.08 per share on May 4, 2010, a one-day decline of over 5%, on high volume.

8.　　The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)　　The failure of a proposed merger between Baxter's two largest competitors was resulting in increased supplies of plasma and increasing pricing pressure;

(b)　　Baxter failed to disclose known trends and uncertainties related to industry operations and the market for its plasma-derivative products, including that the boost in market share and gross profit margin it had experienced while the merger was pending was only temporary and the Company would be unable to sustain the benefits it had enjoyed upon the failure of the merger;

(c)     Baxter's revenue guidance for 2010 related to its plasma-derivative products was misstated and lacked a reasonable basis;

(d)     Baxter had represented to investors that its long-range plan related to its BioScience division was revenue growth in the 7% to 9% range, when in fact the Company was experiencing a loss in market share and pricing pressures related to its plasma-derivative products, such that Baxter's forecasts based on the long-range plan for the BioScience division lacked a reasonable basis;

(e)     The Company failed to disclose that it was not complying with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps; and

(f)     The Company would be unable complete the remediation of the COLLEAGUE pumps in 2010.

9.      As a result of defendants' false statements, Baxter's stock traded at artificially inflated levels during the Class Period.  However, when defendants disclosed the truth about Baxter's actual business prospects going forward, Baxter's stock price fell nearly 27% from its Class Period high, from $61.71 per share on January 14, 2010 to close at $45.08 per share on May 4, 2010. This drop removed the inflation from Baxter's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

11.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

12.     Baxter's principal executive offices are located at One Baxter Parkway, Deerfield, Illinois.

- 3 -

## PARTIES

13.     Plaintiff City of Lakeland Employees Pension Plan purchased Baxter common stock as described in the attached certification and was damaged thereby.

14.     Defendant Baxter, through its subsidiaries, develops, manufactures, and markets products for people with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions.  The Company operates in three segments: BioScience, Medication Delivery, and Renal.  The Company is based in Deerfield, Illinois.

15.     Defendant Robert L. Parkinson, Jr. ("Parkinson") is, and at all relevant times was, Chairman of the Board, President and Chief Executive Officer ("CEO") of Baxter.

16.     Defendant Robert M. Davis ("Davis") was, at all relevant times, Chief Financial Officer ("CFO") and Corporate Vice President of Baxter.

17.     Defendant Norbert G. Riedel ("Riedel") is, and at all relevant times was, Corporate Vice President and Chief Scientific Officer of Baxter.  Defendant Riedel sold 168,100 shares of his Baxter stock at artificially inflated prices for proceeds of nearly $9.7 million during the Class Period.

18.     Defendants Parkinson, Davis and Riedel (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Baxter's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that

the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

19.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Baxter. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Baxter common stock was a success, as it: (i) deceived the investing public regarding Baxter's prospects and business; (ii) artificially inflated the price of Baxter's common stock; (iii) allowed defendant Riedel to sell nearly $9.7 million worth of his own Baxter's common stock at artificially inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Baxter common stock at inflated prices.

20.     The top officers and directors of Baxter also benefited, as the Company's purportedly favorable financial results contributed to the compensation paid to the top officers during the Class Period, some of whom received as much as $14 million per year.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Baxter common stock during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Baxter has more than 584 million shares of stock outstanding, owned by hundreds if not thousands of persons.

23.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Baxter common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

24.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

25.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

27.     Baxter, through its subsidiaries, develops, manufactures and markets products for people with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions. The Company's products are used by hospitals, kidney

dialysis centers, nursing homes, rehabilitation centers, doctors' offices, clinical and medical research laboratories, and by patients at home under physician supervision.

**Baxter's Plasma-Derivative Products**

28.     Baxter has three operation segments: BioScience, Medication Delivery and Renal.  Its BioScience segment is its largest segment.  In 2009, Baxter derived over 44% of its revenue from this segment.  A major part of Baxter's BioScience business involves refining donated plasma to make products that treat problems such as immune-system disorders and hemophilia.  Baxter is the largest supplier of plasma-derivative protein therapies in the world.  The Company's plasma-derivative products and its intravenous immune globulin ("IVIG") antibody therapy products are 22% of Baxter's total sales and a key variable for investors.  In recent years, price increases related to IVIG products have driven much of the growth in the Company's earnings.

29.     In 1990, there were thirteen producers of plasma-derivative products.  Over time the market consolidated and by 2008 there were only five producers of plasma-derivative products, with three of the producers – Baxter, CSL Limited ("CSL") and Talecris Biotherapeutics ("Talecris") – controlling over 80% of the market.

30.     In the late 1990s and early 2000s, there was ample supply of plasma which led to dramatically lower prices.  Suppliers of plasma-derivative products suffered as much as a 30% decline in gross operating margin due to the glut of plasma in the market.  As the industry merged, the supply of plasma was restricted as the acquiring company would invariably close collection centers of the merged company soon after the acquisition.  As CSL noted soon after its acquisition of Aventis Behring in 2004, a merged company would typically cut production capacity by 25%.  The reduction in supply led to improved prices and profits throughout the industry.  Maintaining a supply and demand equilibrium was critical to the success of the suppliers of plasma-derivative products.

31.     In 2008, Talecris, the third-largest supplier of plasma-derivative products, experienced certain manufacturing disruptions, including a shortfall in supply. Baxter benefitted from the supply constraint by gaining market share and by enjoying increases in the price of plasma products. Nonetheless, Talecris announced plans to aggressively expand its production capacity in late 2008 and 2009. Prior to Talecris implementing its planned expansion, CSL, the second-largest supplier of plasma-derivative products, entered into a merger agreement to acquire Talecris for $3.1 billion in August 2008.

32.     On May 27, 2009, the Federal Trade Commission ("FTC") filed a lawsuit to block CSL's proposed acquisition of Talecris on the basis that the merger would be anticompetitive and would violate federal antitrust laws. According to the FTC complaint, the industry already operated "as a tight oligopoly, with a high level of information sharing and interdependence among firms." Producers in the industry had for years realized that they could maximize profits by restricting the supply of plasma-derivative products and raising prices. The FTC believed that the acquisition of Talecris would effectively eliminate the only significant threat to the "durable and highly profitable oligopoly."

33.     As a result of the FTC's lawsuit, CSL abandoned its plans to acquire Talecris on June 9, 2009. After the abandonment of the merger, Talecris subsequently returned to full production in its supply of plasma products to the market. Thus, the insiders at Baxter knew that by the summer of 2009 the temporary boost the Company had enjoyed while the merger was pending had ended.

34.     Additionally, on July 15, 2009, Pemiscot Memorial Hospital initiated a class action suit against Baxter and CSL alleging that the two rivals had created an illegal plasma cartel to engage in a conspiracy to fix the price of life-saving blood plasma products by restricting the supply of plasma, inflating the price of the products and eliminating competition. By February 2010,

eighteen other plaintiffs had joined the class action lawsuit against Baxter and CSL, including the Mayo Clinic, one of the United States' most prestigious and well-funded hospitals.

35.     These factors would adversely affect Baxter's ability to maintain high prices and market share.

**Baxter's COLLEAGUE Pump Products**

36.     Baxter's Medication Delivery segment manufactures and sells electronic infusion pumps that deliver intravenous fluids such as medication or nutrients to patients in a controlled manner.  Baxter began selling its COLLEAGUE pump in the mid-1990s.  However, given numerous design deficiencies, the COLLEAGUE pump came under scrutiny with the FDA beginning in 1999. Nonetheless, Baxter continuously failed to correct the design deficiencies and in 2005 authorities seized more than 6,000 COLLEAGUE pumps that were thought to have serious defects that caused them to shut down or deliver the wrong amount of medication.  As a result, the FDA forced Baxter to stop selling COLLEAGUE pumps in the U.S. market due to various design flaws, battery failures and related software issues.

37.     At the time Baxter stopped selling new COLLEAGUE pumps, around 200,000 of the pumps remained on the market and were still in use at hospitals and other healthcare facilities throughout the country.  In June 2006, Baxter entered into a consent decree with the FDA.  Pursuant to the consent decree, Baxter agreed to not manufacture or distribute any new COLLEAGUE pumps, and the Company further agreed to work with the FDA on a remediation plan to correct the deficiencies of the COLLEAGUE pumps still in operation.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

38.     On September 16, 2009, Baxter hosted an Investor Conference for analysts, media representatives and investors, issuing a press release highlighting discussion points for its 2009 Investor Conference, which stated in part:

*Over its five-year long-range plan period, Baxter expects to increase sales approximately 7 to 8 percent (excluding the impact of foreign currency), grow earnings per share in the 11 to 13 percent range*, and generate strong annual cash flow of approximately $4 billion by the year 2014. The company also plans to continue focusing on innovation and expanding its robust pipeline by increasing investments in R&D at a compounded annual rate of at least 8 to 10 percent.

"We remain committed to transforming our culture to one with a sustained focus on innovation and demonstrating the value of our products and therapies through clinical differentiation," says Robert L. Parkinson, Jr., chairman and chief executive officer. "We believe we have a balanced outlook and are well-positioned to achieve our results while making appropriate investments to enhance future growth and delivering value to shareholders."

\* \* \*

*"We remain focused on delivering growth and achieving our long-term objectives,"* says Robert M. Davis, corporate vice president and chief financial officer. "Our financial performance and disciplined approach toward capital allocation allow us to provide an attractive return to our shareholders while expanding our innovative pipeline and global presence."

39. Defendants Parkinson, Davis and Riedel participated in the September 2009 Investor Conference. During the conference, defendants repeatedly assured investors about the Company's ability to meet its long-range plan, including making the following statements:

- "As you may recall, when we met here in May of 2005, we framed the growth potential of our existing portfolio of businesses. You may remember that we shared our Base Case Long-Range Plan that projected at that time about 5% annual compounded revenue growth over a five-year Long-Range Plan period. At that time, we also discussed our aspiration to exceed that objective through a variety of initiatives. Two years later, in March of 2007, we updated that Long-Range Plan sales growth to approximately 7%. . . . *[W]e believe that our current normalized rate of revenue growth has increased to the 7 to 8% range going forward*. This provides the new Base Case platform for which to view our future."

- "Of course, while we focus our efforts on disciplined growth acceleration, *we've remained diligent ensuring that we continuously improve margins and drive annual EPS increases at a faster rate than revenue growth*. Our confidence in that assertion will I believe be reinforced by the various presentations that you'll hear throughout the day."

- "[O]ur management team has a *fabulous track record of meeting or exceeding our key financial objectives*. . . . Incorporated in our plan is our *expectation of continued margin expansion*, which provides us with the flexibility to invest in select programs and also enhance our short-term and our long-term growth."

- "[W]e're proud of our **sustained success in meeting or exceeding our financial commitments** despite a very challenging global economic climate that has developed. We've achieved record sales resulting in an acceleration of normalized sales growth over the last several years. This success validates the strength and value of our diversified business model and illustrates the solid fundamentals underpinning our portfolio."

- "Given the strength of our Base Case Long-Range Plan and the defined opportunities we have to deliver this growth, the key to our success lies in our ability to execute. **We believe our plans are realistic and achievable** . . . . Two years ago, we laid out a Base Case Long-Range Plan. As I mentioned earlier, we've [sic] or exceeded these objectives. More importantly, over the long term we've consistently improved our outlook. **Our 2009 Long-Range Plan Base Case confirms sustainable improvement in key financial metrics and further validates the success of our strategy**."

- "In summary, as a result of the strong underlying fundamentals and solid growth opportunities across our portfolio, **we're confident that our Base Case assumptions will deliver 7 to 8% sales growth** over the LRP horizon."

- "In BioScience, **we expect revenue growth of 7 to 9%** as we focus on improving access to care and standards of care and drive differentiated value with expanded indications and the development of new therapies."

- "We expect to see continued gross margin expansion across all businesses and regions over the Long-Range Plan. **One of the most frequently asked questions we receive is, given the improvement in gross margin is the margin sustainable and can it expand even further? Well, the answer is yes**. As we've frequently mentioned, there are a number of levers that will drive meaningful gross margin expansion over the Long-Range Plan."

- "Margin improvement has largely been driven by the strength of our BioScience business, which has been our largest and fastest growing business and is also the highest margin business in the company. **Another question we frequently receive from investors is in regard to price improvement and the impact that they've had on our gross margin improvement**. We believe many investors focus on this given the recovery we've experience[d] in the plasma market over the last several years, without fully appreciating the breadth and depth of other margin drivers such as improved product mix, product upgrades, lower cost and improved yield. While price alone has accounted for approximately 25% of the company's overall percentage margin improvement since 2006, other catalysts drove approximately 75% of that change as we've reached the margin of over 50% in 2008."

40.     During the September 2009 Investor Conference, defendants represented the following concerning the Company's COLLEAGUE pump:

[PETER J. ARDUINI, Corporate Vice President – President, Medication Delivery:]

So COLLEAGUE, COLLEAGUE has been a workhorse pump for nearly 15 years. So it wasn't designed with current generation smart pump features, I mean it has limited communication capabilities unlike our next-generation pumps. However, because of the workflow and ease-of-use, it's still favored by many customers worldwide. And as you know, COLLEAGUE is in the midst of being remediated in the U.S. and we will continue to complete our obligations to customers. That being said, as with all older platforms, COLLEAGUE will be phased down in the future and Spectrum and our next-generation pumps will be the platform that we'll base our growth on in the years to come.

\*    \*    \*

[ANALYST:]   Okay. And last just to make sure I understood what you were saying about COLLEAGUE, it sounds like you are hoping to fully resolve or if I remember correctly early 2010 [sic]. Maybe just remind us one, what's left to do to get it fully resolved and added, and two, what should we expect commercially once that's done? I mean and what's assumed in the plan as we see some surge in sales, those people have been waiting or what do we expect? Thank you.

. . . [PARKINSON:]   I mean we continue with the remediation efforts. We have remediated well over 100,000 devices in the U.S. *We continue to work with the FDA on how we move forward and complete that remediation*.

*There has been a number of things that as we have conducted the remediation that was a basis of some follow-on field corrective actions that we announced earlier in the year, that we still need to get, we still need to get tied down, which we're hopeful that we can get that resolved certainly in 2010*.

What Pete pointed out in his presentation is COLLEAGUE was first launched in the U.S. market in what about '96, '97, something like that. So this is well over 10, 12-year-old device that [h]as Pete pointed out in his presentation doesn't have if not a smartphone, but doesn't include a lot of the technology that's represented in many of the devices, including the SIGMA device that we did the deal on and what's reflected in our next generation products.

So the position we are in now, as we want to complete the remediation of COLLEAGUE. We want to understand how our promotional efforts focused on COLLEAGUE going forward, SIGMA and our next generation platform recognizing that the response to SIGMA to date has been very good, very good. And we were moving down a path where we were hopeful that we can launch our next generation platform into the U.S. market in the not-too-distant future.

So we are managing all those things. I think that the good news is for the first time in a long time with the SIGMA deal, we are able to proactively promote an infusion pump. Hospitals continue to hang on to the COLLEAGUES remediated or un-remediated because frankly most of our hospital customers continue to be very satisfied with the product. But it is an aging device and at the right time we need to

reassess where we allocate our promotional focus in our resources between really now a three, what will be a three-product family.

41.     On this news, Baxter's stock closed up $2.41 per share to close at $58.53 per share on September 17, 2009 on high volume.

42.     On October 15, 2009, Baxter issued a press release reporting the Company's financial results for the third quarter of 2009. The Company reported BioScience revenue of $1.4 billion for the quarter. Baxter further forecast sales growth for the fourth quarter of 2009 of 6% to 8%, excluding the impact of foreign currency.

43.     After releasing its third quarter 2009 earnings results on October 15, 2009, Baxter hosted a conference call for analysts, media representatives and investors. During the call defendant Davis stated:

> *To summarize, we continue to see strong demand and favorable year-on-year price improvements across the entire plasma protein portfolio*.
>
> In antibody therapy, sales of $336 million grew 9% and excluding foreign currency, sales advanced 12%. This is the continued result of increased demand and higher year-on-year prices. *Additionally, we continue to estimate demand growth in high single digits at the high-end of the mid to high single digit longer term guidance we provided at our investor conference last month*.

44.     On November 11, 2009, Baxter participated in the Credit Suisse Healthcare Conference for analysts and the media, during which defendant Davis represented the following:

> If you focus on our first business, which is our largest business, that being bioscience. In 2008 we enjoyed sales of $5.3 billion and this was spread across our recombinant franchises, our plasma proteins, regenerative medicine, and vaccines. *As we've talked about at our recent investor conference we had a couple of years ago, we do expect to see growth in this business on the top line of 7% to 9% overall long range plan*. And I'll talk about here in a moment some of the key areas we see, which will really allow us to drive that kind of growth in this business.

45.     On January 12, 2010, Baxter participated in the JP Morgan Healthcare Conference for analysts, media representatives and investors. During the call, defendant Davis represented in part:

- 13 -

- "BioScience is our largest business with sales in 2008 of $5.3 billion. *And as you look out over our long-range horizon, we do expect the BioScience business to continue to grow in the 7% to 9% on a compounded average basis*."

- "Another key franchise for the Company is our plasma biotherapeutics business. And as you can see here from the chart, *we continue to believe we are going to see strong growth in demand in this business*. And I would comment up front that as we look at a lot of noise we've heard recently on people focusing on the quarter-to-quarter moves in this business, *I would take you back to the detailed presentation we gave in September and tell you that our outlook for the long-term of this business with growth in demand in the mid-to high-single digits has not changed*."

- "So as we look at this business, *we continue to have confidence in it, we continue to see it as a sustainable growth business for the Company and one which will continue to drive value for the Company*."

- "So as you look at the culmination of all of those businesses and as we look out over our long-range plan, *we do believe we are going to be able to deliver sales growth in the 7% to 8% range with gross margins approaching 55%*, operating margins around 28%, and you can see EPS in the 11% to 13%. So we will continue to be able to drive good leverage of our sales line into our EPS and, obviously, continue to generate very strong cash flow."

- "Obviously, *a key part of our story over the last couple of years has been our ability to drive gross margin expansion. And I will tell you that we will continue to do this into the future*. And as you look at the drivers of what will allow us to do that, it's largely the same drivers we've had today. It's going to be mix upgrades, first, at the highest level, with business mix driving margin expansion with bioscience being our highest-margin business, also the fastest-growing business, as well as product upgrades within each of the businesses. So you are going to get mix at a different level. And between, really, those two areas, that will be the majority of what will drive margin expansion into the future to that 55% range I mentioned, and has been, frankly, what has driven it up to this point, more so than I think most people understand."

46.     On January 28, 2010, Baxter issued a press release reporting the Company's financial results for the full year and fourth quarter of 2009.  The Company reported BioScience revenue of $1.5 billion for the quarter.  The release further provided:

**First Quarter and Full-Year 2010 Outlook**

Baxter also announced today its guidance for the full year and first quarter of 2010. *For full-year 2010, Baxter expects sales, excluding the impact of foreign exchange, to grow 5 to 7 percent*. Including the benefit of foreign exchange, Baxter expects reported sales growth to increase 7 to 9 percent compared to 2009, based on current exchange rates. *The company also expects earnings per diluted share of*

- 14 -

***$4.20 to $4.28, before any special items***, and expects to generate cash flow from operations of approximately $2.9 billion.

For the first quarter of 2010, Baxter expects sales growth, excluding the impact of foreign exchange, of approximately 5 to 7 percent. Including the benefit of foreign exchange, the company expects reported sales growth of approximately 10 to 12 percent compared to the first quarter of 2009, based on current exchange rates. The company also expects earnings per diluted share of $0.92 to $0.94, before any special items.

"Our 2010 guidance reflects balance across the businesses, continued global expansion, and our ability to deliver sustainable growth," said Robert M. Davis, corporate vice president and chief financial officer. "It is aligned with our long-range strategic and financial objectives, as we remain focused on delivering growth while making appropriate investments for the future."

47.     After releasing its fourth quarter 2010 results on January 28, 2010, Baxter hosted a conference call for analysts, media representatives and investors.  During the call defendants stated in part:

- "For the full year antibody therapy sales totaled $1.4 billion and increased 14% on a constant currency basis driven by higher global demand and year-on-year price increases. I'd mention that ***we remain confident in the underlying fundamentals of this business and have not changed our outlook of mid- to high-single-digit growth in demand over our LRP***."

- "First, for the full year 2010, as you saw in the press release, we expect earnings per diluted share of $4.20 to $4.28. It's important to note that this guidance does not reflect any impact of potential US healthcare legislation reform. As you know, this is an evolving situation. We will continue to monitor the legislative process and we will provide an update to our guidance if and when it's appropriate to do so."

- "By line item of the P&L, we expect full-year sales growth, excluding the impact of foreign currency, of 5% to 7%."

- "***Finally, for the BioScience business we expect sales growth, excluding foreign currency, to be in the 6% to 8% range***. First, we expect recombinant sales growth in the 6% to 8% range. ***Second, we expect plasma protein sales to grow in mid- to high-single-digits, and antibody therapy sales to grow in the mid-single-digit range***. Third, we expect the regenerative medicine business to again grow in mid teens."

- "For the first quarter, as we mentioned in our press release, we expect earnings per diluted share of $0.92 to $0.94 and sales growth, excluding the impact of foreign currency, of 5% to 7%."

- "Clearly 2009 was a very successful year financially, operationally and strategically. While we're certainly not without challenges, *we believe our company is very well positioned for 2010 and beyond*. While no company, including Baxter, is completely immune to the macroenvironment, *given the medically necessary nature of our products, our diversified healthcare model and strong market positions we're confident in our ability to drive improved performance*."

- "*Our 2010 outlook is aligned with our long-range strategic plans* and the solid underlying fundamentals we see in the markets in which we operate. And we remain committed to driving growth while investing in innovation and business development activities that position us for enhanced growth in the future."

- "*[I]t's only been what, four months since our investor conference, but there's nothing that's changed since then that would suggest we would deviate from our long-term outlook, long-term aspirations.* Obviously the guidance we provide of EPS growth in 2010 is right in line with the 11% to 13% compounded EPS growth that we projected over the LRP."

- "So in the context of EPS growth, *2010 is just another year* that I think supports and builds that long-term outlook."

- "So we're hopeful that we'll be in a position to maybe do a few things this year as well that will support that top line. But, *the EPS growth that we're guiding for 2010 is right in line with the messaging for the long-range plan we communicated in September*."

48.     On April 21, 2010, Baxter's shares closed at $58.95 per share.

49.     On April 22, 2010, Baxter issued a press release reporting the Company's financial results for the first quarter of 2010 and providing updated guidance for the second quarter and full year 2010. The release further provided:

**Second Quarter and Full-Year 2010 Outlook**

Baxter also announced today its guidance for the second quarter of 2010 and lowered its guidance for the full year.

*Previously, Baxter expected full-year 2010 sales growth, excluding the impact of foreign exchange, of 5 to 7 percent* (or 7 to 9 percent including foreign exchange); *full-year earnings per diluted share of $4.20 to $4.28, before any special items*; and cash flow from operations of approximately $2.9 billion.

*For full-year 2010, Baxter's revised outlook includes sales growth, excluding the impact of foreign exchange, of 1 to 3 percent* (or 3 to 5 percent including the benefit of foreign exchange) *and earnings, before any special items, of $3.92 to $4.00 per diluted share*. This outlook now includes the full-year impact of

U.S. healthcare reform legislation enacted in the first quarter. In addition, Baxter now expects to generate cash flows from operations of approximately $2.7 billion.

*"Our revised financial guidance primarily reflects the impact of recent healthcare reform legislation in the U.S. and our outlook for continued plasma market pressures,"* explained Robert M. Davis, chief financial officer. "Despite these factors, we will continue to pursue opportunities to enhance growth through the development of new products and business development initiatives, while maintaining an intense focus on managing costs throughout the company."

For the second quarter of 2010, the company expects sales growth, excluding the impact of foreign exchange, of 0 to 2 percent (or 3 to 5 percent including the benefit of foreign exchange), and earnings, before any special items, of $0.90 to $0.93 per diluted share.

50.     On this news, Baxter's stock collapsed $7.82 per share to close at $51.13 per share on April 22, 2010, a one-day decline of over 13%, on volume of more than 50 million shares as artificial inflation came out of the stock price.   This was the largest one-day decline in the Company's stock in over seven years.

51.     On May 3, 2010, Baxter issued a press release announcing it was recalling the COLLEAGUE pumps in the United States.  The release provided in part:

Baxter Healthcare Corporation today announced that it will recall COLLEAGUE infusion pumps from the U.S. market pursuant to an order under its existing June 2006 consent decree with the U.S. Food and Drug Administration (FDA).  Baxter will work with the FDA to ensure that the recall process provides customers appropriate alternatives for supporting patients' needs.

As previously disclosed, Baxter entered into a consent decree with FDA under which the company has been pursuing remediation of the infusion pumps.  The decree permits FDA to require the recall of the pumps, and FDA has communicated to the company that it will require such a recall, with the company providing monetary consideration or replacement pumps to customers on a timeline to be determined with FDA and based on medical need.  Baxter intends to work with FDA to minimize disruption to healthcare facilities using COLLEAGUE pumps.  Baxter anticipates that, among alternatives to be provided to customers, the company will offer to exchange Baxter's Sigma SPECTRUM infusion pumps for COLLEAGUE infusion pumps without charge to customers.

The consent decree permits Baxter to propose alternative actions to achieve the FDA's objectives under the decree, which the company intends to do.  The final nature of the recall and offer to customers remain subject to that ongoing dialogue.

Once final, Baxter will notify customers and make information available on www.baxter.com.

Notwithstanding that uncertainty, the company currently anticipates that it will record a pre-tax special charge of $400 to $600 million in the first quarter for the reasonably estimable cost of the recall. The company is not otherwise revising its earnings guidance for the year in connection with the recall.

52.     Subsequently, on May 3, 2010, the FDA issued a statement concerning Baxter's recall

of the COLLEAGUE pumps, which stated in part:

> *The U.S. Food and Drug Administration sent a letter to Baxter Healthcare Corp. on April 30 ordering the company to recall and destroy all of its Colleague Volumetric Infusion Pumps (Colleague pumps) currently in use in the United States. This action is based on a longstanding failure to correct many serious problems with the pumps*. The FDA believes there may be as many as 200,000 of those pumps currently in use.

> *Additionally, the FDA is ordering the company to provide refunds to customers or replace pumps at no cost to customers [to] help defray the cost of replacement*.

> Infusion pumps are devices that deliver fluids, including nutrients and medications, into a patient's body in a controlled manner. They are widely used in hospitals, other clinical settings and, increasingly, in the home because they allow a greater level of accuracy in fluid delivery.

> Hospitals and other users of Baxter's Colleague pumps will be receiving further instruction and information from Baxter and the FDA regarding their transition.

> The FDA has been working with Baxter since 1999 to correct numerous device flaws. Since then, Colleague pumps have been the subject of several Class I recalls for battery swelling, inadvertent power off, service data errors, and other issues.

> *In June 2006, the FDA was [sic] obtained a consent decree of permanent injunction in which Baxter agreed to stop manufacturing and distributing all models of the Colleague pump until the company corrected manufacturing deficiencies and until devices in use were brought into compliance. Since then, Baxter has made numerous changes to the Colleague pumps but these changes have not corrected the product defect leading to the permanent injunction*.

> On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that Baxter did not plan to begin the latest round of corrections to the adulterated and misbranded pumps until May 2012. The proposal also stated that Baxter does not anticipate completion of the proposed corrections until 2013. On that schedule, a device with known safety concerns would remain in use on patients

- 18 -

needing specialized care until 2013. FDA found this proposal unacceptable. The 2006 consent decree gave FDA authority to take any action it deemed appropriate. *The FDA has determined that this action is necessary, as Baxter has failed to adequately correct, within a reasonable timeframe, the deficiencies in the Colleague infusion pumps still in use*.

Therefore the FDA is now ordering Baxter to:

- Recall and destroy all Colleague infusion pumps.

- Reimburse customers for the value of the recalled device

- Assist in finding a replacement for these customers.

Infusion pumps, including the Baxter Colleague models, have been the source of persistent safety problems. In the past five years, the FDA has received more than 56,000 reports of adverse events associated with the use of infusion pumps. Those events have included serious injuries and more than 500 deaths. Between 2005 and 2009, 87 infusion pump recalls were conducted to address identified safety concerns, according to FDA data.

An FDA analysis of these adverse events has uncovered software defects, user interface problems and mechanical and electrical failures. Problems with infusion pumps are not confined to one manufacturer or one type of device.

In response, last month the FDA announced a new initiative to address safety problems associated with infusion pumps. As part of its initiative, the FDA is moving to establish additional premarket requirements manufacturers will be expected to meet, in part through static testing in FDA's facilities before device submissions. The FDA is also holding a May public workshop on infusion pump design, and the agency is raising public awareness of the issue among health care workers and patients.

53. On this news, Baxter's stock declined $2.42 per share to close at $45.08 per share on May 4, 2010, a one-day decline of over 5%, on high volume.

54. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) The failure of a proposed merger between Baxter's two largest competitors was resulting in increased supplies of plasma and increasing pricing pressure;

(b) Baxter failed to disclose known trends and uncertainties related to the industry operations and the market for its plasma-derivative products, including that the boost in market share

and gross profit margin it had experienced while the merger was pending was only temporary and the Company would be unable to sustain the benefits it had enjoyed upon the failure of the merger;

(c)     Baxter's revenue guidance for 2010 related to its plasma-derivative products was misstated and lacked a reasonable basis;

(d)     Baxter had represented to investors that its long range plan related to its BioScience division was revenue growth in the 7% to 9% range, when in fact the Company was experiencing a loss in market share and pricing pressures related to its plasma-derivative products, such that Baxter's forecasts based on the long range plan for the BioScience division lacked a reasonable basis;

(e)     The Company failed to disclose that it was not complying with the June 2006 consent decree it had entered into with the FDA concerning its COLLEAGUE pumps; and

(f)     The Company would be unable complete the remediation of the COLLEAGUE pump in 2010.

55.     As a result of defendants' false statements, Baxter's stock traded at artificially inflated levels during the Class Period. However, when defendants disclosed the truth about Baxter's actual business prospects going forward, Baxter's stock price fell nearly 27% from its Class Period high, from $61.71 per share on January 14, 2010 to close at $45.08 per share on May 4, 2010. This drop removed the inflation from Baxter's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

56.     By misrepresenting, *inter alia,* the Company's prospects for its plasma-derivative products business, the defendants presented a misleading picture of Baxter's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Baxter's plasma-derivative products business and the plasma market was not as healthy as represented, defendants portrayed

Baxter's plasma-derivative products business as being strong, stable and growing. Additionally, instead of truthfully disclosing during the Class Period that Baxter was not complying with the June 2006 consent decree, defendants assured investors that Baxter was working with the FDA in remediating the COLLEAGUE pumps.

57.     These claims caused and maintained the artificial inflation in Baxter's stock price throughout the Class Period and until the truth was revealed to the market.

58.     On April 22, 2010, defendants were forced to publicly disclose that the Company was reducing its 2010 outlook due to concerns related to its plasma-derivative products business, causing its stock to collapse from $58.95 per share to $51.13 per share in one day.

59.     On May 3, 2010, defendants were forced to disclose that the Company was being forced to recall its COLLEAGUE pumps, causing its stock to collapse from $47.50 per has to $45.08 per share in one day.

60.     As a direct result of defendants' admissions and the public revelations regarding the truth about Baxter's actual business prospects going forward, Baxter's stock price fell nearly 27% from its Class Period high, from $61.71 per share on January 14, 2010 to close at $45.08 per share on May 4, 2010. This drop removed the inflation from Baxter's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

61.     Plaintiff incorporates ¶¶1-60 by reference.

62.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Baxter common stock during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Baxter common stock.  Plaintiff and the Class would not have purchased Baxter common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

65.     Plaintiff incorporates ¶¶1-64 by reference.

66.     The Individual Defendants acted as controlling persons of Baxter within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Baxter stock, the Individual Defendants had the power and authority to cause Baxter to engage in the wrongful conduct complained of herein.  Baxter controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  September 21, 2010                    PLAINTIFF


By: /s/  Marvin A. Miller
MARVIN A. MILLER
MATTHEW E. VAN TINE
LORI A. FANNING
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID J. GEORGE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: 305/529-2801
305/447-8115 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF LAKELAND EMPLOYEES PENSION PLAN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of September , 2010.

> CITY OF LAKELAND EMPLOYEES PENSION PLAN
>
> By: _____
>
> Its: _Vice - Chairman_____

- 2 -

BAXTER

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/30/2009 - SD | 3,500 | $54.86 |
| 04/27/2010 - SD | 8,300 | $50.06 |
| 04/27/2010 - SD | 8,500 | $51.39 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 02/17/2010 - SD | 13,950 | $55.97 |

*Opening position of 69,950 shares.

**Settlement dates are indicated with "SD" attached to the date.