UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LAKELAND EMPLOYEES PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:10-cv-06016 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | Assigned to: Judge John J. Tharp, Jr. |
| vs. | ) ) | |
| BAXTER INTERNATIONAL INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ..................................................................................1

II.    STATEMENT OF FACTS COMMON TO THE CLASS .................................................3

      A.     Background ...........................................................................................3

      B.     The Colleague .......................................................................................3

            1.     Baxter's Attempted Compliance with the Consent Decree .......................4

            2.     Defendants' False and Misleading Class Period Statements Regarding Remediation of the Colleague .....................................7

            3.     The Truth Is Revealed..................................................................9

      C.     Baxter Raised Forecasts Despite Declines in Demand in Its BioScience Business ................................................................................9

            1.     Baxter's BioScience Business.......................................................9

            2.     Defendants' False and Misleading Class Period Statements Regarding Demand for Baxter's Plasma-Derivative Products .................11

            3.     The Truth Is Revealed..................................................................12

III.   PROCEDURAL HISTORY....................................................................................13

IV.    ARGUMENT .....................................................................................................14

      A.     Courts Favor Class Treatment of Securities Fraud Class Actions.........................14

      B.     The Proposed Class Satisfies the Prerequisites of Rule 23(a) .............................15

            1.     The Class Is so Numerous that Joinder of All Members Is Impracticable..............................................................................16

            2.     Questions of Fact and Law Are Common to Members of the Class .........17

            3.     Lead Plaintiff's Claims Are Typical of Those of the Class ....................19

            4.     Lead Plaintiff Will Fairly and Adequately Represent the Class ...............20

      C.     The Proposed Class Satisfies Rule 23(b)(3) ..............................................22

            1.     Common Questions of Law or Fact Predominate....................................22

**Page**

a.     Lead Plaintiff Is Entitled to Utilize the Fraud-on-the Market Theory ........................................................................................25

2.     A Class Action Is Superior to Other Available Means of Adjudication.................................................................................31

V.     CONCLUSION..........................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................21, 24, 25

*Beagle v. Edgemark Fin. Corp.,*
    164 F.R.D. 649 (N.D. Ill. 1995)............................................................23

*Butler v. Sears, Roebuck and Co.,*
    Nos. 11-8029, 12-8030, 2012 WL 5476831 (7th Cir. Nov. 13, 2012) ....................................23

*Cammer v. Bloom*
    711 F. Supp. 1264 (D.N.J. 1989) .........................................................26, 27, 29

*Cheney v. Cyberguard Corp.,*
    213 F.R.D. 484 (S.D. Fla. 2003) ..........................................................31

*De La Fuente v. Stokely-Van Camp, Inc.,*
    713 F.2d 225 (7th Cir. 1983) ..............................................................19

*Erica P. John Fund v. Halliburton Co.,*
    __ U.S. __, 131 S. Ct. 2179 (2011)........................................................23, 24

*In re Anicom Inc. Sec. Litig.,*
    No. 00 C 4391, 2002 WL 472249 (N.D. Ill. Mar. 27, 2002) ...........................................15, 32

*In re Bank One Sec. Litig./First Chicago S'holder Claims,*
    No. 00 CV 0767, 2002 WL 989454 (N.D. Ill. May 14, 2002)............................14, 15, 25, 32

*In re DVI, Inc. Sec. Litig.,*
    639 F.3d 623 (3d Cir. 2011)...............................................................26

*In re Neopharm, Inc. Sec. Litig.,*
    225 F.R.D. 563 (N.D. Ill. 2004)...........................................................14, 16, 19, 25

*In re Sys. Software Assocs., Inc. Sec. Litig.,*
    No. 97 C 177, 2000 WL 1810085 (N.D. Ill. Dec. 8, 2000) .................................15, 16, 23, 25

*In re Xcelera.com Sec. Litig.,*
    430 F.3d 503 (1st Cir. 2005)..............................................................26

*Keele v. Wexler,*
    149 F.3d 589 (7th Cir. 1998) .............................................................17, 18

*King v. Kansas City S. Indus., Inc.,*
    519 F.2d 20 (7th Cir. 1975) ..............................................................14

**Page**

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ........................................................26, 29, 30, 31

*Levitan v. McCoy*,
    No. 00 C -5096, 2003 WL 1720047 (N.D. Ill. Mar. 31, 2003) ...............................14

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    256 F.R.D. 586 (N.D. Ill. 2009) ....................................................................14, 24

*Matrixx Initiatives, Inc. v. Siracusano*,
    __ U.S. __, 131 S. Ct. 1309 (2011) ......................................................................23

*Messner v. Northshore Univ. Healthsystem*,
    669 F.3d 802 (7th Cir. 2012) ................................................................................22

*Miller v. Material Scis. Corp.*,
    No. 97 C 2450, 1999 WL 495490 (N.D. Ill. June 28, 1999) .................................15

*Neil v. Zell*,
    275 F.R.D. 256 (N.D. Ill. 2011) ...........................................................................16

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
    No. 97 C 7694, 1999 WL 543209 (N.D. Ill. July 23, 1999) .................................15

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ........................................................................17, 19

*Roth v. Aon Corp.*,
    238 F.R.D. 603 (N.D. Ill. 2006) ........................................................14, 17, 18, 19

*Schleicher v. Wendt*,
    No. 1:02-CV-1332-DFM-TAB, 2009 WL 761157 (S.D. Ind. Mar. 20, 2009),
    *aff'd*, 618 F.3d 679 (7th Cir. 2010) ...........................................................15, 24, 26

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ..................................................................... *passim*

*Silverman v. Motorola, Inc.*,
    259 F.R.D. 163 (N.D. Ill. 2009) ................................................................. *passim*

*Sutton v. Bernard*,
    No. 00 C 6676, 2001 WL 1646564 (N.D. Ill. Dec. 21, 2001) ...............................15

*Tatz v. Nanophase Techs. Corp.*,
    No. 01 C 8440, 2003 WL 21372471 (N.D. Ill. June 13, 2003) .................... *passim*

**Page**

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)................................................................26

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ............................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    ___U.S. __, 131 S. Ct. 2541 (2011)..................................................15

*Weiner v. Quaker Oats Co.*,
    No. 98 C 3123, 1999 WL 1011381 (N.D. Ill. Sept. 30, 1999)..............15

*Wilson v. Collecto, Inc.*,
    No. 03 C 4673, 2004 WL 432509 (N.D. Ill. Feb. 25, 2004)..................15

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §10(b) .....................................................................................20, 23, 24
    §20(a) .........................................................................................20, 23

21 U.S.C.
    §360...................................................................................................4

Federal Rules of Civil Procedure
    Rule 23 ..................................................................................... *passim*

17 C.F.R.
    §240.10b-5 ..............................................................................20, 23, 24

21 C.F.R.
    Part 820 ........................................................................................6, 8

Lead Plaintiff National Elevator Industry Pension Fund ("Lead Plaintiff") respectfully submits this memorandum of law in support of its Motion for Class Certification (the "Motion").[1] Lead Plaintiff seeks to certify this securities litigation as a class action on behalf of those persons and entities who purchased or otherwise acquired the publicly traded common stock of Baxter International Inc ("Baxter" or the "Company") from June 10, 2009 through May 3, 2010, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[2] Lead Plaintiff also requests to be appointed the Class representative. During the Class Period, Lead Plaintiff purchased 102,800 shares of Baxter common stock and lost in excess of $1.5 million. Lead Plaintiff further requests that the Court appoint its selected counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as Class Counsel and Miller Law LLC ("Miller Law") as Liaison Counsel for the Class.

## I.    PRELIMINARY STATEMENT

This is a routine federal securities case that meets all the requirements of Rule 23 of the Federal Rules of Civil Procedure for class certification. *See Schleicher v. Wendt*, 618 F.3d 679, 681-82 (7th Cir. 2010) (Easterbrook, C.J.) ("When a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action."). The Class members are so numerous and geographically dispersed across the country so that joinder would be impracticable. As the proposed Class representative, Lead Plaintiff's claims present common questions of law and fact and are typical of other Class members' claims. Moreover, Lead Plaintiff is more than adequate to represent the Class. The common questions here predominate over any

---

[1] By Order dated November 30, 2010, the Court appointed National Elevator Industry Pension Fund as Lead Plaintiff and approved its selection of Class Counsel and Liaison Counsel. [Dkt. No. 40.]

[2] Excluded from the Class are: (1) Defendants; (2) members of the Individual Defendants' immediate families; (3) any entity in which Defendants have or had a controlling interest; (4) Baxter's officers and directors; and (5) the legal representatives, heirs, successors, or assigns of any excluded party.

individual questions, and the class action process is superior to any other method of adjudicating these claims. Accordingly, this case should be certified as a class action, Lead Plaintiff should be appointed Class representative, and Robbins Geller and Miller Law should be appointed Class Counsel and Liaison Counsel for the Class, respectively.

This federal securities class action arose out of uniform misrepresentations to all Class members and the investing public made by Baxter and Individual Defendants Robert M. Davis ("Davis"), Richard L. Parkinson ("Parkinson"), and Mary Kay Ladone (collectively, "Defendants") during the Class Period. The Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") [Dkt. No. 74] alleges that Defendants knowingly or with severe recklessness made material misrepresentations and/or failed to disclose material facts concerning two specific issues: (1) the Company's compliance with the terms of the June 2006 Consent Decree entered into with the United States Food and Drug Administration (the "FDA") regarding the remediation of the Company's Colleague infusion pump (the "Colleague"); and (2) demand for Baxter's plasma-derivative products. When the truth about each category of Defendants' Class Period statements was revealed through two disclosures, the share price of Baxter common stock dropped precipitously, resulting in nearly two billion dollars in investor losses.

This case is eminently suited for class treatment. The Class is large, the issues are common, Lead Plaintiff is typical of absent Class members, and both Lead Plaintiff and its counsel are more than adequate. A class action is superior to the prosecution of thousands of individual cases, and is easily managed. Lead Plaintiff requests that its Motion be granted.

## II.    STATEMENT OF FACTS COMMON TO THE CLASS

### A.    Background

Baxter is a global healthcare company that develops, manufactures, and markets a variety of healthcare products.  ¶55.[3]  During the Class Period, Baxter operated through three segments: BioScience, Medication Delivery, and Renal.  ¶56.  In 2009, Baxter's BioScience segment, which includes the Company's plasma-derivative products business, generated $5.6 billion in sales, and the Medical Delivery segment, which includes the Colleague, generated $4.65 billion in sales, accounting for approximately 45% and 37%, respectively, of the Company's total sales.  ¶¶56-57.

### B.    The Colleague

Baxter began selling the Colleague in the United States in 1997, and it quickly became the market-leading infusion pump, with more than 205,000 units sold domestically.  ¶60.  Not long after, the Colleague began suffering from numerous design, user interface, and battery deficiencies, and fell under FDA scrutiny.  *Id.*  Since that time, the Colleague has caused numerous patient deaths and has been the subject of at least seven Class I recalls for, among other things, battery failure, inadvertent powering off, data service errors, and software issues.  ¶¶60-61.

On June 29, 2006, Baxter, Parkinson, and Peter Arduini (the Company's then-Vice President and President of Baxter's Medication Delivery Services) entered into a Consent Decree with the FDA regarding the Colleague.  ¶64.  Of importance, the Consent Decree: (1) permanently enjoined Baxter and Parkinson from "manufacturing, processing, packing, repacking, labeling, distributing, or importing into the United States any model or components" for its Colleague pumps in the United States; (2) required Baxter and Parkinson to provide the FDA with written notice as to how the

---

[3] All paragraph references ("¶__") are to the Complaint unless otherwise noted.  All emphasis is added and internal quotes, citations, and footnotes are omitted unless otherwise noted.

Company would remediate the Colleague pumps; (3) mandated that Baxter could not begin any remediation efforts without the FDA's prior written authorization; (4) required Baxter to retain an independent expert to conduct inspections at Baxter's facilities that manufactured, processed, or distributed the Colleague, and to review and determine whether Baxter's methods, facilities, and controls were operated and administered in conformity with FDA regulations; (5) required Baxter to report to the FDA in writing "Baxter's current state of compliance" with respect to good manufacturing practices and quality systems regulation; and (6) required Baxter and Parkinson to submit a detailed "Corrective Action Plan" or "CAP" to bring the Company's Colleague pumps currently "in use in the United States by physicians, hospitals, pharmacies, and other users/facilities into compliance with" FDA regulations. ¶¶64-68. The Consent Decree also gave the FDA the ability to order any additional corrective actions it deemed necessary to achieve compliance, including a complete recall of the Colleague, if Baxter failed to comply with any provision of the Consent Decree. ¶67.

### 1. Baxter's Attempted Compliance with the Consent Decree

To comply with the Consent Decree, Baxter had to accomplish three things: (1) remediate the single channel Colleague pumps; (2) remediate the triple channel Colleague pumps; and (3) gain FDA approval for an entirely new Colleague pump. ¶71. Prior to remediating the Colleague or introducing a new model, the Company was required to get 510(k) clearance,[4] which requires device manufacturers to notify the FDA of an intent to market a medical device at least 90 days in advance. ¶72. The FDA had identified a number of defects with the Colleague, and, as a result, the FDA's Office of Device Evaluation ("ODE"), the division responsible for clearing 510(k) submissions, had

---

[4] *See* 21 U.S.C. §360.

frequent meetings and conversations with the Company and its high-ranking executives between 2006 and 2009 to discuss problems with the Colleague. ¶73. During these meetings and through numerous other communications, the FDA consistently rejected Baxter's proposals and timelines for remediation. ¶¶74-90.

During a November 25, 2008 meeting with the Company, the FDA imposed a new and unique remediation requirement on Baxter. ¶¶76-82. In addition to rejecting as "unsatisfactory" the Company's remediation timeline, which stated the Company could not bring a new pump into the market until 2014 or 2015, the FDA also informed Baxter that the Company would now be required to submit clinical data to supplement any future 510(k) filings for both remediation of the triple channel pump, as well as for a new Colleague device. ¶¶76-77. This new, undisclosed requirement mandated clinical trials on the Colleague, meaning it would take the Company, at a minimum, several years to generate the data necessary for an acceptable 510(k) submission. This would, therefore, significantly delay and complicate or even render impossible completion of the Colleague's remediation. ¶81. *See* Declaration of David J. George, Esq. in Support of Lead Plaintiff's Motion for Class Certification ("George Declaration" or "George Dec."), ***Exhibit 1***.

Furthermore, throughout the Class Period, Baxter suffered from numerous quality systems problems that rendered the Company incapable of remediating the Colleague. ¶¶94-95. After initially attempting to overhaul the Company's entire quality control systems (as required by the Consent Decree), the Company instead decided to focus on overhauling the quality organization for only the Colleague. ¶95. Among other things, Baxter lacked "design traceability" on the Colleague as there were no coordinated databases or software applications at Baxter. ¶¶95-97, 99. For example, when a new software system was put in place at the Company, Baxter's Global Infusion Systems did not implement the software, instead choosing to operate in isolation. ¶98.

- 5 -

As required by the Consent Decree, Baxter hired third-party auditors to inspect the Colleague-related facilities and Baxter's internal quality systems. ¶101. The result of these inspections was that Baxter was non-compliant with FDA regulations. ¶109. During April and May 2009, the FDA continued to question Baxter's quality systems. ¶110. Specifically, Baxter failed to conform with 21 C.F.R. Part 820, the "Quality System Regulation." *Id.* Absent Part 820 compliance, Baxter was ***incapable*** of undertaking the clinical trials necessary to provide the FDA with the clinical data now required to support an acceptable 510(k) submission. ¶¶110-111.

On August 10, 2009, Baxter participated in a meeting with the FDA and presented another Colleague remediation timeline, which the FDA again rejected. ¶116. At this meeting, the FDA informed Baxter that it needed to submit a new CAP supplement that included the Company's latest proposal and that the Company should engage the ODE in discussions regarding its forthcoming 510(k) submission. ¶117. Baxter, which remained non-compliant with Part 820, was still not in a position to initiate or propose any clinical trials required by the FDA. *Id.*

Baxter indicated to the ODE that the Company would submit its pre-Investigational Device Exemption ("IDE") by the end of September 2009. ¶¶119-120. This deadline went unmet. Defendants knew Baxter could not submit a satisfactory 510(k) because of the clinical data requirement. ¶120. By October 2009, Baxter continued to fail to take the necessary and timely corrective actions to remediate the violative Colleague pump, to submit an acceptable 510(k) application based on clinical data, or to improve the Company's quality systems to comply with the terms and conditions of the Consent Decree. ¶123. It was not until late 2009 that Baxter, aware that the FDA would no longer tolerate the Company's ongoing remediation failures, utilized an "all hands on deck" mentality, with 90% of employees within Global Infusion Systems reassigned to

work on the Colleague.  ¶¶131-149.  Even with the extra manpower, Baxter remained *incapable* of initiating a clinical study on the Colleague.

At this time, Baxter's "active dialogue" with the FDA deteriorated, and Baxter, as an experienced medical device company, knew the FDA's shift in tone was a signal of impending, punitive regulatory action.  ¶¶128-130.  None of this was ever disclosed.

### 2. Defendants' False and Misleading Class Period Statements Regarding Remediation of the Colleague

Defendants made numerous false and misleading statements throughout the Class Period concerning remediation of the Colleague.  Indeed, Defendants often assured investors that Baxter was executing its Colleague "remediation plan."  ¶237 ("as the remediation plan is executed").  For example, Defendants told the market that the "COLLEAGUE [was] in the midst of being remediated" (¶223), and that Baxter was "continu[ing] to work with the FDA on how we move forward and complete that remediation" (¶224).  According to Defendants, remediation was successfully underway.  Even when stating that there was a possibility of "new information, changes in estimates, and modifications to the current remediation plan" (¶¶217, 256), Defendants still told investors that there was a "remediation plan."  In addition, Defendants misled the market as to Baxter's "remediation plan" by stating that Baxter was engaged in "active dialogue" with the FDA about remediation of the Colleague (¶¶217, 237, 256), that the Company "continue[d] to be committed to remediating" the Colleague (¶201), and that the Company would "continue to complete [its] obligations to customers" with respect to remediation in the U.S. (¶223).

Throughout the Class Period, however, Defendants knew Baxter had no viable remediation plan in place because of the undisclosed, FDA-imposed clinical data requirement.  Defendants also knew it would take at least two years for Baxter to complete any clinical trials, but Defendants never disclosed that fact.  More importantly, Defendants never disclosed that Baxter lacked the necessary

FDA approval required to even start the clinical trials. Specifically, unsold Colleague devices remained on lockdown following the Consent Decree. In order to physically move those devices for purposes of clinical testing, Baxter needed an IDE from the FDA. An IDE permits the movement of a misbranded and/or adulterated medical device for the limited purpose of conducting a clinical study. To facilitate the IDE process, the FDA allows companies to submit a "pre-IDE" – essentially a draft IDE that the FDA's ODE can review and comment on.

In September 2009, Baxter indicated to the FDA's ODE that a pre-IDE would be forthcoming. Later that month, however, Baxter informed the FDA that the pre-IDE would not be made on time. Thus, Baxter remained forbidden from moving the Colleague to start the multi-year clinical trial process. Then, in October 2009, Baxter submitted a pre-IDE to the FDA. Ignoring the FDA's clinical data requirement, Baxter's pre-IDE requested that clinical data ***not be included*** in studies on the Colleague, but that nonclinical, simulated data could be used instead. "Defendants knew the Company's submission was grossly insufficient and would be rejected." ¶123. It was at this time that the FDA decided to initiate its "Triple R" remedy and the FDA's Office of Compliance effectively cut off its dialogue with Baxter.

The market knew none of this. Defendants never notified the market of the FDA's imposition of the unique and unusual clinical data requirement, or the dramatic change in dialogue with the FDA concerning remediation of the Colleague. ¶¶91-157. Instead, Defendants' Colleague-related statements remained positive and remarkably constant as Defendants assured Baxter investors that the Company's "remediation plan" was on track and was being executed. Defendants' static statements during the Class Period omitted key facts as it became increasingly apparent that Baxter would be unable to remediate the Colleague within a time period acceptable to the FDA. ¶¶123-130, 150-157. Not only did Baxter remain non-compliant with Part 820, but the Company

- 8 -

had no clinical data and was incapable of even initiating a clinical study on the Colleague. ¶¶118, 122-123. Based on these objective facts, Baxter could neither remediate the Colleague nor submit a viable 510(k). Because Defendants never disclosed the clinical data requirement, which effectively sent Baxter back to "square one" with the Colleague, each of Defendants' Class Period statements was false and misleading when made.

### 3. The Truth Is Revealed

At the end of the Class Period, the FDA's concerns about the Colleague reached crisis level, and the FDA ordered the literal destruction of every Colleague in the United States. ¶124. On May 3, 2010, Baxter notified the market that the FDA implemented the "Triple R," requiring Baxter to recall and destroy, refund, and replace all Colleague pumps existing within the United States. ¶160. The FDA determined Baxter had failed to adequately correct, within a reasonable timeframe, the deficiencies in the Colleague pumps still in use, and ordered that Baxter: (1) recall and destroy all Colleague pumps; (2) reimburse customers for the value of the recalled devices; and (3) assist in finding replacement pumps for those customers. *Id.* In response to the "Triple R," the price of Baxter stock dropped $2.42 per share, or 5%, to close at $45.08 on May 4, 2010, on unusually heavy trading volume. ¶277.

### C. Baxter Raised Forecasts Despite Declines in Demand in Its BioScience Business

### 1. Baxter's BioScience Business

Prior to and during the Class Period, Baxter engaged in a host of anti-competitive misconduct designed to improperly control and manipulate the United States market for blood plasma and

plasma-derivative products.[5]  Currently, there are five producers of plasma-derivative products, with three of the producers – Baxter, CSL Limited, CSL Behring, CSL Plasma (the last three collectively referred to as "CSL"), and Talecris Biotherapeutics Holdings Corporation ("Talecris") – controlling 85% of the plasma-derivative products market.  ¶170.

In order to maintain significant growth in market share and revenue, Baxter and CSL needed to ensure their coordinated ability to control the market by securing their positions as the only large suppliers of plasma-derivative products.  ¶176.  By 2006, however, Baxter and CSL were faced with increased competition from Talecris.  *Id.*  Talecris was the third largest supplier of plasma-derivative products and the only other company with the manufacturing capacity to potentially impact and increase the supply of plasma-derivative products.  *Id.*  The emergence of Talecris as another major producer of plasma-derivative products threatened the stranglehold Baxter and CSL had on the market for these products.  *Id.*  Put simply, Baxter's pricing, margin, market share, and BioScience revenues were at risk if Talecris' rising production disrupted Baxter's carefully coordinated domination of the plasma-derivative products market.  *Id.*

In 2008, Talecris experienced manufacturing disruptions and decreased supply.  ¶165.  Baxter benefitted as a result, gaining market share and expanding its profit margins as diminished supply drove prices up.  *Id.*  Before Talecris could recover and implement its planned expansion, CSL Limited, the second-largest supplier of plasma-derivative products, entered into a merger

---

[5] To be clear, it is not the control and manipulation of the market for blood plasma and plasma-derivative products that gives rise to the fraud claims herein.  Any such claims are being litigated in an antitrust case being prosecuted in *In re: Plasma-Derivative Protein Therapies Antitrust Litigation*, 09 C 7666, currently pending in the Northern District of Illinois, Eastern Division.  Instead, it is Defendants' failure to disclose that these practices drove the Company's margins, revenues, and future business prospects, and that the Company's margins and revenues would shrink if it was unable to manipulate and control the market for these products, which underlies the fraud.  ¶164.

agreement to acquire Talecris for $3.1 billion. *Id.* On May 27, 2009, the Federal Trade Commission ("FTC"), in response to an eight-month investigation into an illegal and anti-competitive price fixing cartel between Baxter and CSL, authorized a lawsuit to block the Talecris-CSL merger, alleging it would reduce competition. ¶¶166-167, 179. The FTC investigation and lawsuit described in detail how Baxter and CSL worked together in an attempt to manipulate the supply and demand for plasma-derivative products, and how the Talecris-CSL merger was an act in furtherance of the companies' anti-competitive conduct. ¶¶169-171, 180-182.

On June 8, 2009, CSL and Talecris abandoned their merger. ¶183. Following this news, several hospitals and healthcare companies brought antitrust class actions against Baxter, among others. ¶186. With the merger off, Talecris resumed full production of plasma-derivative products, and Defendants knew Baxter's temporary boost in revenue, profit margins, and demand had ended. ¶¶184-185.

### 2.     Defendants' False and Misleading Class Period Statements Regarding Demand for Baxter's Plasma-Derivative Products

Defendants told the market throughout the Class Period that the Company was "continu[ing] to see robust growth in demand" that would "drive revenue growth approximating 10%." ¶198. Moreover, Davis told investors the Company had "geographic expansion opportunities" that would drive growth and that the Company would go after "latent demand." *Id.* Defendants' positive statements regarding the outlook of the Company's plasma-derivative products business remained constant during the Class Period. *See, e.g.*, ¶¶200, 208, 225, 241. Additionally, Defendants assured the market that Baxter would continue to experience strong demand and expanded margins in its BioScience business, which resulted in the Company issuing and then reaffirming its positive financial guidance. *See, e.g.*, ¶¶204, 206, 210, 221, 229-230. Based on statements regarding unmet demand and the Company's ability to drive product to meet this demand, Defendants issued positive

financial guidance and raised Baxter's outlook during the Class Period. *See, e.g.*, ¶¶204, 220, 230. For example, at the beginning of the Class Period, during Baxter's July 16, 2009 conference call. Davis stated, "[f]or BioScience, we expect sales growth excluding foreign currency to be in the 10% to 12% range." ¶207. Along with issuance of this guidance, Davis confirmed that Defendants were not "seeing any emerging market weakness" or "material erosion of share." ¶¶214-215.

Throughout the Class Period, Defendants' message to investors was clear: nothing had changed in its plasma-derivative products business. ¶¶250, 259. Defendants, however, failed to reveal that the Company was anticipating decreased market share once Talecris returned as a competitor and therefore took active steps to ***lower*** the Company's intake of blood. ¶¶188-189. Among other things, the Company lowered donor fees, decreased hours of operation at its intake facilities, and lowered the marketing budgets for the Company's plasma collection centers. ¶190. Contrary to Defendants' statements, Baxter was not seeking to drive growth to target unmet demand.

### 3. The Truth Is Revealed

On April 22, 2010, the Company reported its first quarter 2010 financial results and lowered its revenue and earnings outlook for full-year 2010. ¶¶12, 263. Defendants revealed, contrary to their statements throughout the Class Period, that due to continuing pressures in its critical plasma-derivative products business, including a loss in market share, the Company was reducing its revenue guidance for full-year 2010, to revenue growth in the range of 1% to 3%, down from a previous range of 5% to 7%. *Id.* Specifically, the Company disclosed it was reducing its revenue guidance for its plasma-derivative products business from growth in the mid-to-high-single-digit range to a ***decline*** in the mid-single-digit range, and it was reducing its revenue guidance for antibody therapy products from growth in the mid-single-digit range to a decline in the 10% to 15% range. *Id.*

Baxter's revelation of the Company's true financial condition and future business prospects caused the price of its common stock to fall by $7.82 to close at $51.13 on April 22, 2010, a one-day decline of more than 13%, with a trading volume of more than 50 million shares. ¶¶13, 271. The sudden drop represented the largest one-day decline in the Company's stock price in more than seven years. *Id.*

## III.   PROCEDURAL HISTORY

On April 15, 2011, Lead Plaintiff filed the Complaint, which Defendants moved to dismiss on May 27, 2011. [Dkt. No. 77.] After the motion was fully briefed, on January 23, 2012, Judge Sharon J. Coleman issued an Order granting in part and denying in part Defendants' motion (the "Order"). [Dkt. No. 87.] The Order sustained all allegations in the Complaint, with one minor exception: statements "with respect to allegations that [Baxter] failed to disclose information related to the CSL and Talecris merger." Order at 5. Therefore, the Order left intact claims and allegations that Defendants "failed to disclose that changes to [Baxter's] plasma collections combined with changes to the market known to Baxter, assuming the facts to be true, [were] sufficient to undermine Baxter's argument that its positive sales projections had a reasonable basis." *Id*. As recognized in the Order, there is a distinction between statements regarding the failed merger and statements regarding the impact of the failed merger on Baxter's plasma business, outlook, and financial projections. Importantly, not one of Defendants' false and misleading statements was dismissed from the Complaint.

Following Defendants' unsuccessful Petition for Interlocutory Appeal, on July 16, 2012, this Court signed the parties' Stipulated Case Management Order that set deadlines for, among other things, discovery, class certification, and expert reports [Dkt. No. 112] (the "Case Management Report"). Extensive discovery is underway and ongoing.

## IV.    ARGUMENT

### A.    Courts Favor Class Treatment of Securities Fraud Class Actions

"It is established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases." *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006); *Levitan v. McCoy*, No. 00 C -5096, 2003 WL 1720047, at *2 (N.D. Ill. Mar. 31, 2003) ("securities fraud cases are uniquely situated to class action treatment"); *Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 WL 21372471, at *3 (N.D. Ill. June 13, 2003) (same); *see also Schleicher*, 618 F.3d at 681, 682 ("When a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action . . . [C]lass certification is routine" in securities cases).

Indeed, courts in this circuit recognize that "securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits.  The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing." *Tatz*, 2003 WL 21372471, at *3.  "A class action is often the most fair and practicable means to address claims in securities cases" because "those who have been injured are in poor position to seek legal redress . . . because individual claims might be too small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation." *In re Bank One Sec. Litig./First Chicago S'holder Claims*, No. 00 CV 0767, 2002 WL 989454, at *2 (N.D. Ill. May 14, 2002).  Accordingly, there is a "strong policy favoring class certification in securities fraud cases." *Roth*, 238 F.R.D. at 605.[6]

---

[6] Courts in the Seventh Circuit routinely certify securities class actions pursuant to Rule 23.  *See e.g.*, *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586 (N.D. Ill. 2009); *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 26 (7th Cir. 1975) (Sprecher, J.); *Schleicher*, 618 F.3d 679; *Silverman v. Motorola, Inc.*, 259 F.R.D. 163 (N.D. Ill. 2009); *Roth*, 238 F.R.D. at 605; *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563 (N.D. Ill.

For a class action to be certified pursuant to Rule 23, the four requirements of Rule 23(a) must be satisfied, as well as at least one of the conditions under Rule 23(b). "Class certification depends not on which side will prevail but on whether the requirements of Federal Rule of Civil Procedure 23 are met." *Schleicher v. Wendt*, No. 1:02-CV-1332-DFM-TAB, 2009 WL 761157, at *2 (S.D. Ind. Mar. 20, 2009), *aff'd*, 618 F.3d 679 (7th Cir. 2010). Even if the Court here were to "probe behind the pleadings," there is ample record evidence, even at this early stage of this litigation, supporting each of the elements of Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, ___U.S. __, 131 S. Ct. 2541, 2551-52 (2011). As demonstrated below, this securities case satisfies each requirement and, therefore, class certification is proper.

**B.    The Proposed Class Satisfies the Prerequisites of Rule 23(a)**

Rule 23(a) allows class treatment where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." These four requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. *See Wilson v. Collecto, Inc.*, No. 03 C 4673, 2004 WL 432509, at *1 (N.D. Ill. Feb. 25, 2004).

---

2004); *Tatz*, 2003 WL 21372471; *Bank One*, 2002 WL 989454, at *2; *In re Anicom Inc. Sec. Litig.*, No. 00 C 4391, 2002 WL 472249, at *3 (N.D. Ill. Mar. 27, 2002); *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 1646564, at *2 (N.D. Ill. Dec. 21, 2001); *In re Sys. Software Assocs., Inc. Sec. Litig.*, No. 97 C 177, 2000 WL 1810085, at *4 (N.D. Ill. Dec. 8, 2000); *Weiner v. Quaker Oats Co.*, No. 98 C 3123, 1999 WL 1011381, at *1 (N.D. Ill. Sept. 30, 1999); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 1999 WL 543209, at *1 (N.D. Ill. July 23, 1999); *Miller v. Material Scis. Corp.*, No. 97 C 2450, 1999 WL 495490, at *5 (N.D. Ill. June 28, 1999).

### 1. The Class Is so Numerous that Joinder of All Members Is Impracticable

Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no fixed number that satisfies the numerosity requirement, but courts have found that as few as 10 to 40 class members is sufficient. *Tatz*, 2003 WL 21372471, at *5; *see also Neil v. Zell*, 275 F.R.D. 256, 260 (N.D. Ill. 2011) ("[a]lthough there is no 'bright line' test for numerosity, a class of forty is generally sufficient"). A plaintiff is not required to identify the exact number of class members, however, the plaintiff "must show some evidence or reasonable estimate of the number." *Tatz*, 2003 WL 21372471, at *5. Further, in securities fraud lawsuits involving "nationally traded securities, numerosity may be assumed." *Sys. Software*, 2000 WL 1810085, at *1; *see also Neopharm*, 225 F.R.D. at 565 (considering the stock traded on the NASDAQ and had more than 16 million shares outstanding, "[i]t can be reasonably inferred that hundreds, if not thousands, of persons would be included in the proposed class").

Here, numerosity may easily be assumed. During the Class Period, Baxter traded on the New York Stock Exchange ("NYSE"), an open and efficient market. Indeed, Baxter had approximately 602.5 million shares outstanding, and the average daily trading volume during the Class Period exceeded 4.6 million shares, which further supports a finding of numerosity. *See* Declaration of Steven P. Feinstein, Ph.D., CFA ("Dr. Feinstein") in Support of Lead Plaintiff's Motion for Class Certification ("Feinstein Dec.") at ¶38, a true and correct copy of which is attached to the George Declaration as ***Exhibit 2***. Such trading volume dwarfs that which has been deemed sufficient to infer numerosity in other securities fraud cases. *See Tatz*, 2003 WL 21372471, at *6 (inferring hundreds of class members given 13 million shares traded over the entire relevant time period). Although the exact number of Class members cannot be determined until after completion of discovery, it is reasonable to conclude that there are thousands of individuals and entities located

throughout the United States who purchased or otherwise acquired Baxter common stock at artificially inflated prices during the Class Period, and that these shareholders are geographically dispersed.

### 2. Questions of Fact and Law Are Common to Members of the Class

Commonality exists if questions of law and fact are common to members of the proposed class. "The commonality requirement is not difficult to meet" and "has been characterized as a low hurdle, easily surmounted." *Roth*, 238 F.R.D. at 606. Commonality is usually satisfied when a common nucleus of operative facts unites a class. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (Harlington, J.). This is especially true when defendants "have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (Coffey, J.). In such circumstances, "each class member's claim hinges on the same conduct by the defendants." *Tatz,* 2003 WL 21372471, at *6. As such, this District routinely concludes that the commonality requirement is satisfied in securities fraud actions just like this one. *See id.; Roth*, 238 F.R.D. at 609; *Motorola*, 259 F.R.D. at 169.

Here, Lead Plaintiff's and the Class' claims arise out of the same alleged course of conduct – Defendants' omissions and issuance of materially false and misleading statements during the Class Period concerning remediation of the Colleague pump and Baxter's BioScience Financial forecasts based on demand for Baxter's plasma-derivative products. ¶¶4-8. That is, Defendants' alleged false statements and omissions were uniformly made to the Class – investors received the same information via press releases, conference calls, analyst presentations, media appearances, and through filings with the Securities and Exchange Commission ("SEC"), as set forth in the Complaint. Therefore, the same facts that give rise to Lead Plaintiff's claims also give rise to the claims of all members of the proposed Class. Absent Class members necessarily would have to

prove the identical facts and answer identical legal questions if they pursued their individual claims. This is the heart of commonality. Lead Plaintiff, like other Class members, purchased Baxter common stock based on the integrity of the market when Defendants' misconduct was reflected in Baxter's stock price. ¶¶20, 286-294. As a result, all Class members' claims arise out of the common nucleus of facts, and all Class members were damaged by Defendants' "standardized conduct" during the Class Period. *Keele*, 149 F.3d at 594.

Based on the common course of fraud alleged, numerous common questions of law and fact are shared by the Class members, such as: (1) whether Defendants violated federal securities laws; (2) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts; (3) whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated; (4) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of; (5) whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts; (6) whether the market price of Baxter common stock during the Class Period was artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and (7) whether Class members have sustained damages as a result of the decline in value of Baxter's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages. ¶36.

As described above, securities fraud complaints alleging such common questions consistently are considered prime candidates for class certification. *See, e.g., Roth*, 238 F.R.D. at 605; *Tatz*, 2003 WL 21372471, at *1; *Motorola*, 259 F.R.D. at 163. As detailed by the many authorities cited above, the common legal and factual questions here more than satisfy the low hurdle of commonality.

### 3.     Lead Plaintiff's Claims Are Typical of Those of the Class

The "typicality" requirement of Rule 23(a)(3) is "closely related" to the "commonality" requirement. *Roth*, 238 F.R.D. at 606. Whereas the "commonality" requirement focuses on the class as a whole, the "typicality" requirement focuses on whether the class representative's claims have "the same essential characteristics as the claims of the class at large." *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (Cudahy, J.). Because "typicality" and "commonality" are closely related, "[a] finding that commonality exists generally results in a finding that typicality also exists." *Tatz*, 2003 WL 21372471, at *6.

A class representative's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Neopharm*, 225 F.R.D. at 566. The rule, however, does not require that each class member "suffer exactly the same injury" as the class representative. *Tatz*, 2003 WL 21372471, at *6. In fact, "[t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente*, 713 F.2d at 232. "Courts are directed to liberally construe the typicality requirement." *Roth*, 238 F.R.D. at 606. Indeed, courts "look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)." *Rosario*, 963 F.2d at 1018.

Here, Lead Plaintiff's claims are identical to those of the Class insofar as they arise out of the same course of Defendants' conduct and are premised on the exact same legal theory. *See* George Dec., ***Exhibit 3***, Defendants' Responses to Lead Plaintiff's First Request for Admissions ("Defendants' Admissions") at Response No. 9 (Defendants admit that "Baxter had no direct communications with Lead Plaintiff."). For example, Lead Plaintiff and other members of the proposed Class allege Defendants' dissemination of materially false and misleading public information inaccurately portrayed and otherwise falsified information regarding remediation of the

- 19 -

Colleague pump and demand for Baxter's plasma-derivative products. This artificially inflated the price of Baxter common stock throughout the Class Period and caused harm as the falsity of Defendants' statements was revealed along with Baxter's true operating and financial condition. Moreover, Lead Plaintiff's claims surrounding Defendants' uniform conduct are premised on the same legal theory as each Class members': Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Thus, Lead Plaintiff's and the Class' claims are typical within the meaning of Rule 23.

### 4.     Lead Plaintiff Will Fairly and Adequately Represent the Class

Pursuant to Rule 23(a)(4), the representative party must "fairly and adequately protect the interests of the class." "To establish that they will fairly and adequately protect the interests of the class, class representatives must show that: (1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them." *Motorola*, 259 F.R.D. at 173. Demonstrating that a class representative meets these standards is not difficult; "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient." *Id*. Lead Plaintiff, proposed Class Counsel, and Liaison Counsel for the Class more than satisfy these adequacy requirements.

Lead Plaintiff has no conflicts of interest with other Class members. Lead Plaintiff, like the other Class members, was damaged as a result of Defendants' unlawful conduct during the Class Period, and Lead Plaintiff will have to prove the same wrongdoing as the absent Class members in order to establish Defendants' liability. Lead Plaintiff purchased 102,800 shares of Baxter common stock during the Class Period and suffered losses in excess of $1.5 million. Thus, Lead Plaintiff has more than a sufficient interest in the outcome of the litigation to ensure vigorous advocacy. *See* George Dec., ***Exhibit 4***. Lead Plaintiff has already demonstrated its vigorous prosecution of the

claims brought in this action on behalf of itself and the Class by conducting an extensive investigation into Defendants' fraud, shepherding the Complaint past Defendants' motions to dismiss and for interlocutory appeal, and aggressively pursuing discovery. *See generally* George Dec. Finally, no Class members have been or will be disadvantaged by the proposed Class representative's representation in this action.[7]

Furthermore, Lead Plaintiff, proposed Class Counsel, Robbins Geller, and Liaison Counsel for the Class, Miller Law, have vigorously prosecuted this action since its inception and will continue to do so until its conclusion. Lead Plaintiff is willing and able to represent the Class in this action and understands the commitments and fiduciary responsibilities attendant to serving as Class representatives.

In addition to satisfying Rule 23(a)(4)'s adequacy prong, Lead Plaintiff's counsel also satisfies the considerations of Rule 23(g) and should be appointed Class Counsel. Rule 23(g)(4) requires the Court to appoint counsel who will fairly and adequately represent the Class. Additionally, in appointing class counsel, Rule 23(g)(1)(A) requires the Court to consider the following factors: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.

As demonstrated by Robbins Geller's and Miller Law's firm résumés (*see* George Dec., ***Exhibits 5 & 6***), Robbins Geller and Miller Law are comprised of highly competent lawyers who

---

[7] Although Defendants often argue that certain Class representatives are inadequate because they must prove reliance, Lead Plaintiff has pled and the Class is entitled to the fraud-on-the-market presumption of reliance, which is subject to Class-wide proof. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

possess substantial experience in litigating class actions on behalf of aggrieved investors and consumers, and the firms are adequately prepared to continue to prosecute this action.

To be sure, Robbins Geller – the largest class action firm in the nation – has extensive experience in the prosecution and successful resolution of complex class actions in courts in this District and throughout the United States. *See* George Dec., ***Exhibit 7***. Moreover, Robbins Geller and Miller Law have demonstrated their willingness to commit substantial resources to representing the Class through their efforts in prosecuting this action to date. As such, there should be no question about the competence of counsel to fairly and adequately represent the interests of the Class, and the requirements of Rule 23(a)(4) and Rule 23(g) are satisfied.

### C. The Proposed Class Satisfies Rule 23(b)(3)

In addition to meeting the requirements of Rule 23(a), a class action must also satisfy at least one of the three conditions imposed by Rule 23(b). Here, Lead Plaintiff moves for class certification under Rule 23(b)(3), which authorizes class certification where: (1) the "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As set forth below, this case more than meets both standards.

### 1. Common Questions of Law or Fact Predominate

Rule 23(b)(3) requires that common questions of law and fact predominate over questions affecting individual class members. "There is no mathematical or mechanical test for evaluating predominance." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 814 (7th Cir. 2012) (Hamilton, J.). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of antitrust laws." *Id*. at 814-15. "While common questions of law or fact must predominate, they need not be exclusive. To determine whether common questions predominate, courts look to whether there is a 'common nucleus of operative facts.'" *Tatz*, 2003 WL 21372471, at

*9. "The principal issues of law and fact relate to defendants' alleged misrepresentations" and "are common to the members of the class." *Sys. Software*, 2000 WL 1810085, at *4. "Predominance is a question of efficiency." *Butler v. Sears, Roebuck and Co.*, Nos. 11-8029, 12-8030, 2012 WL 5476831, at *2 (7th Cir. Nov. 13, 2012) (Posner, J.). Indeed, "[a] court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate." *Tatz*, 2003 WL 21372471, at *9.

The Complaint alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. The elements comprising a private securities fraud class action include: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund v. Halliburton Co.*, __ U.S. __, 131 S. Ct. 2179, 2184 (2011); *Matrixx Initiatives, Inc. v. Siracusano*, __ U.S. __, 131 S. Ct. 1309, 1317 (2011).

Loss causation and damages are not required to be proven at the class certification stage and do not present individual questions of fact or law. *Halliburton*, 131 S. Ct. at 2186 ("The Court of Appeals erred by requiring [plaintiff] to show loss causation as a condition of obtaining class certification.");[8] *Schleicher*, 618 F.3d, at 687. The only individual issues likely to be raised in this litigation relate to damages. But individual issues regarding damages do not defeat class certification. *See Beagle v. Edgemark Fin. Corp.*, 164 F.R.D. 649, 658 (N.D. Ill. 1995) ("The only individual issues involve questions of damages . . . [which have] not been held to bar a class

---

[8] In *Halliburton*, the Supreme Court fully resolved the question of whether plaintiffs are required to prove loss causation at the class certification stage, and holding that plaintiffs are not required to do so. 131 S. Ct. at 2187.

- 23 -

action."); *Schleicher*, 2009 WL 761157, at *14 ("The need for such individual damage determinations does not necessarily defeat class certification."). Consequently, the sole issue presented in this Motion is whether the requirements of Rule 23 are met.

In securities cases, "[w]hether common questions of law or fact predominate . . . often turns on the element of reliance." *Halliburton*, 131 S. Ct. at 2184. In order to address reliance and facilitate securities class actions, in *Basic*, the Supreme Court established a rebuttable presumption of class-wide reliance based on the "fraud-on-the-market" theory. 485 U.S. at 242; *Halliburton*, 131 S. Ct. at 2185. "In general, the theory allows the court to presume that investors in a market variously described as 'impersonal,' 'open,' 'developed,' and 'efficient' relied on the integrity of the market price that reflected available public information, including statements the issuer and its agents had made to the market." *Schleicher*, 2009 WL 761157, at *5. In *Basic*, the Supreme Court described the fraud-on-the-market doctrine as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

485 U.S. at 241-42. The Supreme Court determined that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Id*. at 242.

Here, the Class is entitled to the fraud-on-the-market presumption of reliance. When asserting a securities fraud claim under Section 10(b) or Rule 10b-5, a showing of market efficiency establishes the requisite causal link between the defendants' material misrepresentations and omissions and the class' injury. *Tatz*, 2003 WL 21372471, at *7; *Makor*, 256 F.R.D. at 595 (holding

that "[b]ecause [plaintiffs] are entitled to a presumption of reliance, individual issues of reliance can not predominate over the numerous common issues"); *Motorola*, 259 F.R.D. at 174 (holding that "class members need not prove reliance on an individualized basis – class reliance will be presumed – if plaintiffs can show that the alleged misrepresentation was materially and publicly transmitted into a well-developed market"); *Bank One*, 2002 WL 989454, at *7 (finding "issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue").

### a. Lead Plaintiff Is Entitled to Utilize the Fraud-on-the-Market Theory

In order to gain the benefit of the presumption of reliance under the fraud-on-the-market theory, a plaintiff must establish that: (1) the defendant made public misrepresentations; (2) the misrepresentations were material; (3) the shares were traded on an efficient market; (4) the misrepresentations would induce a reasonable investor to misjudge the value of the shares; and (5) the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed. *Basic*, 485 U.S. at 248 n.27; *see also Schleicher*, 618 F.3d, at 682 (finding that the security in questions listing on the NYSE, average daily trading volume of four million, market capitalization that exceeded $2 billion, and extensive analyst coverage were sufficient to invoke *Basic*'s fraud-on-the-market theory).

Lead Plaintiff satisfies these elements and is entitled to a presumption of reliance. First, the Court already held that Lead Plaintiff alleged that Defendants made numerous public misrepresentations and that, at this stage in the litigation, the misrepresentations were material. *See* Order at 4-6. Second, Baxter common stock traded in an efficient market during the Class Period. Indeed, numerous courts have concluded that a stock's inclusion on a national stock exchange is a strong indicator of market efficiency. *See Sys. Software*, 2000 WL 1810085, at *1; *Neopharm*, 225

F.R.D. at 565 (considering the stock traded on the NASDAQ and had more than 16 million shares outstanding, "[i]t can be reasonably inferred that hundreds, if not thousands, of persons would be included in the proposed class"). Here, the fact that Baxter was traded on the NYSE throughout the Class Period is strong evidence that the market for its common stock was efficient.

Moreover, an analysis of the collective factors enumerated in the oft-cited *Cammer v. Bloom* opinion establishes there was an efficient market for Baxter common stock during the Class Period. 711 F. Supp. 1264 (D.N.J. 1989). The *Cammer* factors, which are used to determine whether a market is efficient enough to apply the fraud-on-the-market theory, include: "(1) whether the stock trades at a high weekly volume; (2) whether securities analysts report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3, as opposed to Form S-1 or S-2; and (5) whether there are empirical facts showing a causal relationship between unexpected corporate events or public releases and a subsequent response in stock price." *Schleicher*, 2009 WL 761157, at *5 (citing *Cammer*, 711 F. Supp. at 1286-87). While the Seventh Circuit has not expressly adopted the *Cammer* factors, they have been widely considered in other circuits. *See e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 210 (2d Cir. 2008) (accepting the use of *Cammer* factors as an "analytical tool" for determining market efficiency); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005) (affirming application of the *Cammer* factors); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (affirming the application of the *Cammer* and *Krogman* factors). Indeed, these factors were applied by Judge Andersen of this Court in certifying the class in *Tatz*. 2003 WL 21372471, at *7.

Applying these well-developed and accepted factors here demonstrates the market efficiency for Baxter common stock during the Class Period. For example, under *Cammer*, high weekly

trading volume is indicative of market efficiency because "many investors are executing trades on the basis of nearly available or disseminated corporate information." 711 F. Supp. at 1286. There is a "substantial presumption" of efficiency where weekly trading volume exceeds 1% of total shares outstanding and a "strong presumption" at 2%. *Id.* Baxter's weekly trading volume during the Class Period was 23 million shares. Feinstein Dec. at ¶38. Thus, Baxter's weekly trading volume averaged 3.8% of total outstanding shares, which was well above the accepted threshold, thus providing a strong presumption of market efficiency. *Id.* at ¶39; Defendants' Admissions at Response No. 13 (Defendants admit that "weekly trading volume of Baxter common stock averaged 3.8% of shares outstanding during the Class Period.").

Moreover, under *Cammer*, extensive coverage by securities analysts also indicates market efficiency as the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis. *Cammer*, 711 F. Supp. at 1286. During the Class Period, at least 12 different securities firms covered Baxter. Feinstein Dec. at ¶¶41-45; Defendants' Admissions at Response No. 10 (Defendants admit that "Baxter common stock was followed by at least 12 securities analyst firms during the Class Period."). This coverage of Baxter by professional securities analysts is evidence of the efficiency of the market for Baxter common stock during the Class Period.

The existence of market makers and arbitrageurs for a stock further demonstrates market efficiency. *Cammer*, 711 F. Supp. at 1286-87. "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed

price level." *Id*. Sufficient market makers, institutional investors, and arbitrageurs[9] existed in Baxter common stock. Feinstein Dec. at ¶¶46-54; Defendants' Admissions at Response No. 15 (Defendants admit "there were active market makers for Baxter common stock during the Class Period."). First, there were at least 300 market makers for Baxter common stock. *Id*. at ¶53. Second, during the Class Period, between 81.2% and 83.8% of Baxter shares were held by institutional investors. *Id*. at ¶47; Defendants' Admissions at Response No. 14 (Defendants admit that "more than 80% of Baxter shares were held beneficially or nominally by institutional investors during the Class Period."). These institutional investors actively adjusted their holdings of Baxter common stock, providing further evidence that the market for Baxter common stock was efficient during the Class Period. *Id*. The high number of market makers and large percentage of institutional ownership is further evidence that the market for Baxter common stock was efficient during the Class Period.

Baxter was also eligible to file Forms S-3 with the SEC during the Class Period, which is indicative of market efficiency because a company is entitled to S-3 registration when, among other things, it has filed Exchange Act reports for 12 months and had an outstanding float of over $75 million coupled with annual trading volume over 3 million shares. Feinstein Dec. at ¶¶55-56; Defendants' Admissions at Response No. 16 (Defendants admit that "Baxter was eligible to file a SEC Form S-3 Registration Statement during the Class Period."). Baxter's common stock float averaged $33.7 billion during the Class Period (ranging between $28.0 and $37.1 billion), far exceeding the level required for S-3 registration. *Id*. at ¶59. Further, Baxter had been filing financial reports with the SEC for many years prior to the start of the Class Period and remained

---

[9] An arbitrageur is an experienced investor who attempts to profit from a price difference in the market by making simultaneous trades that off-set each other and capture risk-free profits.

current during the Class Period.  *Id.* at ¶¶60-63.  Consistent with *Cammer*, Baxter's ability to file an S-3 registration is evidence of the efficiency of the market for Baxter common stock.

Further, "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  The empirical factor is "the essence of an efficient market and the foundation for the fraud on the market theory."  *Id.* at 1287.  This factor is also met here.  As detailed in his expert report, Dr. Feinstein completed a comprehensive analysis of the market efficiency for Baxter common stock during the Class Period by utilizing scientifically sound and accepted methodologies.  Feinstein Dec. at ¶¶78-122.  Specifically, Dr. Feinstein performed a statistical event study to determine whether the reaction of Baxter's common stock price to news announcements was statistically significant.  *Id.*  In addition, Dr. Feinstein calculated the expected return on Baxter common stock.  As a result, Dr. Feinstein determined the following dates during the Class Period illustrated a cause and effect relationship: July 16, 2009; October 15, 2009; January 22, 2010; January 28, 2010; April 22, 2010; and May 4, 2010.  *Id.* at ¶¶101-122.  The dates of most significance to this action are April 22, 2010 and May 4, 2010, the dates Baxter common stock dropped in response to Defendants' end of Class Period disclosures.

In addition to the five *Cammer* factors that indicate market efficiency, Dr. Feinstein also considered supplemental tests cited in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).  The *Krogman* factors include: (1) the company's market capitalization; (2) the stock's float; and (3) the typical bid-ask spread.  Feinstein Dec. at ¶¶32-36.

"Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *Krogman*, 202 F.R.D. at 478.  During

the Class Period, Baxter's market capitalization averaged $33.8 billion. Feinstein Dec. at ¶65. This market capitalization average ranks in the first decile relative to all other publicly traded companies in 2009 and 2010, meaning that Baxter's average market capitalization was larger than the market capitalizations of more than 90% of all other publicly traded companies in the United States. *Id*. at ¶¶65-67. Therefore, consistent with *Krogman*, Baxter's large market capitalization throughout the Class Period is further evidence of the efficiency of the market for Baxter common stock.

The bid-ask spread is the difference between the price at which investors are willing to buy stock and the price at which current stockholders are willing to sell their shares. *Krogman*, 202 F.R.D. at 478. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id*. During the Class Period, the average bid-ask spread for Baxter common stock was 0.03%, or in dollar terms, $0.01 per share. *Id*. at ¶¶71-77. By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the Center for Research in Security Prices ("CRSP") database was 1.07%, or the CRSP dollar bid-ask spread average was $0.10.[10] *Id*. at ¶¶74-75. Baxter's bid-ask spreads were therefore narrower than the mean level among all other CRSP stocks, which comprised stocks traded on the NYSE, Amex, NASDAQ, and the NYSE Arca, thereby supporting the existence of an efficient market for Baxter stock.

The public float is the number or value of shares that can potentially trade freely in the marketplace. Here, Dr. Feinstein concludes the public float of Baxter common stock averaged $33.7 billion, or 99.8%, during the Class Period, indicating market efficiency. Feinstein Dec. at ¶¶69-70;

---

[10] The CRSP Market Total Return Index is the generally accepted and widely used measure of the overall stock market performance used by Dr. Feinstein in his analysis.

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003) (public float of 95% is indicative of an efficient market.); *Krogman*, 202 F.R.D. at 478 (public float of 46% weighed against market efficiency).

Based on the *Cammer* and *Krogman* factors, as well as Dr. Feinstein's corroborative analysis and his inclusion of additional tests for market efficiency, the market for Baxter common stock during the Class Period was efficient and appropriately gives rise to a presumption of reliance sufficient to meet the predominance element of Rule 23(b)(3).

Finally, it is evident that Lead Plaintiff purchased Baxter common stock after the misrepresentations were made but before the truth was revealed. The Class Period in this action began on June 10, 2009. According to Lead Plaintiff's certification, it purchased Baxter common stock seven times between April 12-27, 2010, which is after Baxter's initial misrepresentations were made and before the truth was revealed. *See* George Dec., ***Exhibit 3***.

### 2. A Class Action Is Superior to Other Available Means of Adjudication

Rule 23(b)(3) sets forth the following factors to be considered by the Court when making its "superiority" determination:

> (A) [T]he class members' interest in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in a particular form; and (D) the likely difficulties in managing a class action.

Securities actions easily satisfy the superiority requirement of Rule 23 because: (1) absent a class action, defendants and the courts face potentially thousands of individual lawsuits, all arising out of the same set of operative facts; (2) the resolution of common issues alleged in one class action will result in efficient use of judicial resources and a single outcome that is binding on all defendants and class members; (3) any administrative difficulties in handling potential individual issues that

may arise are less burdensome than the problems which are likely to arise in administering hundreds or thousands of separate actions; and (4) because of the prohibitive expenses of maintaining individual actions, denial of class certification here would effectively prevent numerous individuals from asserting their claims against defendants and severely weaken the protections provided to investors under the federal securities laws. As a result, a class action is not only superior, but perhaps the only feasible way to litigate the claims alleged in this action. *See Bank One*, 2002 WL 989454, at *8 (finding that "Rule 23 was designed for this exact type of case"); *Anicom*, 2002 WL 472249, at *3 (finding that a class action is superior to other methods of adjudication for the securities fraud action).

## V.      CONCLUSION

In light of the foregoing, Lead Plaintiff's Motion should be granted. Accordingly, an Order should be entered: (1) certifying this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure; (2) appointing Lead Plaintiff National Elevator Industry Pension Fund as Class representative; and (3) appointing Robbins Geller Rudman & Dowd LLP as Class Counsel and Miller Law LLC as Liaison Counsel for the Class.

DATED: January 28, 2013        */s/ Lori A. Fanning*
                                  LORI A. FANNING

                           MARVIN A. MILLER
                           MATTHEW E. VAN TINE
                           LORI A. FANNING
                           **MILLER LAW LLC**
                           115 S. LaSalle Street, Suite 2910
                           Chicago, IL 60603
                           Telephone: 312/323-3400
                           312/626-2676 (fax)
                           mmiller@millerlawllc.com
                           mvantine@millerlawllc.com
                           lfanning@millerlawllc.com

                           *Liaison Counsel for Lead Plaintiff and*
                           *Proposed Liaison Counsel for the Class*

                           DAVID J. GEORGE
                           ROBERT J. ROBBINS
                           BAILIE L. HEIKKINEN
                           HOLLY W. KIMMEL
                           **ROBBINS GELLER RUDMAN**
                             **& DOWD LLP**
                           120 East Palmetto Park Road, Suite 500
                           Boca Raton, FL 33432
                           Telephone: 561/750-3000
                           561/750-3364 (fax)

                           JASON A. FORGE
                           **ROBBINS GELLER RUDMAN**
                             **& DOWD LLP**
                           655 West Broadway, Suite 1900
                           San Diego, CA 92101
                           Telephone: 619/231-1058
                           619/231-7423 (fax)

                           *Counsel for Lead Plaintiff and Proposed Class*
                           *Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

I, Lori A. Fanning, hereby certify that on January 28, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

_/s/ Lori A. Fanning_____