## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LAKELAND EMPLOYEES PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:10-cv-06016 |
| Plaintiff, | ) ) | Hon. John J. Tharp, Jr. |
| vs. | ) ) ) | |
| BAXTER INTERNATIONAL INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF PROFESSOR ALLEN FERRELL

I, Allen Ferrell, declare as follows:

## I.      Qualifications

1.      I am an economist and the Greenfield Professor of Securities Law at Harvard Law School, where I have taught since 1998.   I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School.   My Ph.D. concerned the relationship between stock prices and financial disclosures.   After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.      I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, and a member of the editorial board of the *Journal of Financial Perspectives*.   I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which is responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial

Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.     I have testified before the U.S. Senate Subcommittee on Securities, Insurance and Investment and presented to, among others, the Securities and Exchange Commission, the World Bank, International Monetary Fund, the Structured Products Association and the National Bureau of Economic Research.  I have published approximately thirty articles in leading journals in the general area of law and finance, including on the use of event studies and the estimation of price impact in securities litigation.  I have also been an expert witness in a number of securities cases, and my work has included conducting event studies and assessing price impact.  My testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as Appendix A.

4.     I am being compensated at my customary hourly rate of $950 per hour for my work on this matter.  My compensation is not contingent on the outcome of this matter.  I have received the assistance of the staff employed by Compass Lexecon. Appendix B lists the materials I have considered in my analysis.

## II.     Introduction and Summary of Conclusions

5.     Baxter International Inc. ("Baxter" or the "Company") "develops, manufactures and markets products that save and sustain the lives of people with

hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions." Baxter SEC Form 10-K for the fiscal year ended December 31, 2009 at 1. During the time period involved in this litigation, Baxter had three business segments: BioScience, Medication Delivery, and Renal. *Id.* In particular, the BioScience segment "processe[d] recombinant and plasma-based proteins to treat hemophilia and other bleeding disorders; plasma-based therapies to treat immune deficiencies, alpha 1-antitrypsin deficiency, burns and shock, and other chronic and acute blood-related conditions; products for regenerative medicine, such as biosurgery products; and vaccines" and the Medication Delivery segment "manufacture[d] intravenous (IV) solutions and administration sets, premixed drugs and drug-reconstitution systems, pre-filled vials and syringes for injectable drugs, IV nutrition products, infusion pumps, and inhalation anesthetics, as well as products and services related to pharmacy compounding, drug formulation and packaging technologies." *Id.*

6.    On April 22, 2010, Baxter issued a press release that reported "First Quarter 2010 Financial Results In-Line with Guidance." *See* Exhibit 1. In this press release, the Company also announced lowered guidance for the full year 2010; specifically, sales growth (excluding the impact of foreign exchange) was reduced from 5-7 percent to 1-3 percent and earnings per diluted share (before any special items) was reduced from $4.20-$4.28 to $3.92-$4.00. *See id.* The press release

stated that "[t]his outlook now includes the full-year impact of U.S. healthcare reform legislation enacted in the first quarter." *See id.* Baxter's CFO explained that "[o]ur revised financial guidance primarily reflects the impact of recent healthcare reform legislation in the U.S. and our outlook for continued plasma market pressures." *See id.*

7.    On May 3, 2010, Baxter issued a press release announcing that the Company "will recall COLLEAGUE infusion pumps from the U.S. market pursuant to an order under its existing June 2006 consent decree with the U.S. Food and Drug Administration (FDA)." *See* Exhibit 2.  The press release stated that "the company currently anticipates that it will record a pre-tax special charge of $400 to $600 million in the first quarter for the reasonably estimable cost of the recall." *See id.*

8.    Lead Plaintiff alleges that the Defendants [1] made "false and misleading statements" and "fail[ed] to disclose highly material information to the market" between June 10, 2009 and May 3, 2010, inclusive (the "Class Period"), which caused Baxter's stock price to be "artificially inflated."  Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") ¶¶ 1 & 16.  Specifically, Lead Plaintiff claims that Defendants made positive allegedly false and misleading statements on eleven dates regarding the

---

1.    The Defendants are:  Baxter; Chairman of the Board, CEO, and President Robert L. Parkinson Jr.; CFO and Corporate Vice President Robert M. Davis; and Corporate Vice President of Investor Relations Mary Kay Ladone.  Complaint ¶¶ 1 & 22-4.

prospects for Baxter's plasma-derivative products and its commitment to remediate its Colleague infusion pumps in accordance with the 2006 consent decree. *Id.* ¶¶ 26, 198, 204, 217, 220, 227, 237, 240, 241, 246, 256 & 259. In particular, Lead Plaintiff claims that alleged false and misleading statements on June 10, 2009, July 16, 2009, and September 16, 2009 caused Baxter's stock price to increase on June 11, 2009, July 16, 2009, and September 17, 2009. *Id.* ¶¶ 203, 219 & 226. Lead Plaintiff further claims that the alleged false and misleading statements maintained the artificial inflation in Baxter's stock price throughout the Class Period. *Id.* ¶ 290. Lead Plaintiff asserts that the falsity of Baxter's alleged misstatements was revealed to the market on April 22, 2010 and May 3, 2010. *Id.* ¶¶ 12-15.

9.   In January 2013, Lead Plaintiff submitted the Declaration of Steven P. Feinstein, Ph.D., CFA in Support of Plaintiffs' Motion for Class Certification ("Feinstein Declaration"). In his declaration, Professor Feinstein opines that "Baxter common stock traded in an efficient market over the course of the Class Period." Feinstein Declaration ¶ 16. Among other things in support of his opinion, Professor Feinstein prepared a statistical analysis of the relationship between information and stock price movements known as an "event study." *Id.* ¶¶ 80-122. Based on his event study, Professor Feinstein opines in particular that: 1) on July 16, 2009, "the price of Baxter stock increased in response to the better-than-expected quarterly EPS and earnings guidance released that morning;" 2) on April

22, 2010, "the price of Baxter stock declined in response to the reduced 2010 earnings guidance announced that morning;" and 3) on May 4, 2010, "the price of Baxter stock declined in response to the COLLEAGUE recall announced the previous evening." *Id.* ¶¶ 104, 112 & 119.

10.     I have been asked by counsel for the Defendants to analyze whether there is any reliable basis to associate a price impact with the alleged false and misleading statements.  Based on my review and analysis of the materials listed in Appendix B, I have reached the following principal conclusions.

- There is no reliable basis to associate the alleged false and misleading statements with a price impact following their disclosure.

- There is no reliable basis to conclude that the price movements on the alleged corrective disclosure dates are a measure of the price impact of the alleged false and misleading statements.

I provide the bases for these conclusions in the remainder of this declaration.

### III.     There is No Reliable Basis to Associate the Alleged False and Misleading Statements with a Price Impact Following Their Disclosure

11.     In this section I focus on whether there is a reliable economic basis for associating the alleged false and misleading statements with a contemporaneous price impact.  To determine whether information impacted the price of a stock that is traded in an efficient market, an economist first must assess whether concurrent with the information disclosure, a price change net of market and industry factors

occurred of a sufficient magnitude to be considered statistically significant.[2]  If the firm-specific price change cannot be considered statistically significant, the price change cannot be attributed to any concomitant disclosure of information because there is too high a likelihood that the change is attributable to random chance alone.   Accordingly,  if  the  alleged  false  and  misleading  statements  that  are purported to have caused artificial inflation are not associated with a statistically significant firm-specific price increase (and hence artificial inflation), then there is no reliable economic basis to associate these disclosures with a price impact.

12.   If  the  contemporaneous  firm-specific  price  increase  is  statistically significant, a second step involves assessing whether the reason for the observed price increase is the specific information disclosure at issue or other unrelated information.  For example, if other "confounding" information could have caused the observed increase, then one cannot reliably associate the alleged false and misleading statement(s) with the price impact observed.  As another example, if the same information was disclosed earlier, then repeating the information will not cause a price impact in an efficient market and, hence, the cause for the observed price increase must lie elsewhere.

---

2.    Professor Feinstein and I both use the 95 percent confidence level as the threshold for statistical significance.  Feinstein Declaration n. 37.

A.    Event Study Method

13.    In securities litigation, event studies are commonly used in assessing the price impact of allegedly misrepresented information. An event study is a regression analysis that measures the effect of an event, such as a firm's earnings announcement, on a firm's stock price. In such an analysis, one controls for factors other than the event under investigation that also may have affected the stock price in part by using a market model that can account for contemporaneous market and industry movements. The estimation of the market model quantifies the extent to which the firm's stock price moves with the general market and a portfolio of firms within its industry. The resulting firm-specific price changes are referred to as "residual returns."

14.    I reviewed the market model Professor Feinstein used in his event study analysis. To control for movements in the overall stock market, he used the CRSP Market Total Return Index. Feinstein Report ¶ 91. To control for movements in Baxter's industry, he used the S&P 500 Health Care Index, to which the Company had compared its stock price performance. *Id.* ¶ 92. I use these same market and peer indices in my regression model.

15.    Estimating a market model requires the choice of an estimation period to measure the volatility of the stock's residual returns; this volatility measure is referred to as the "standard error." I used the commonly employed estimation

period of one year prior to the event,[3] in this case one year prior to the date of each statement at issue.

16.    The event study estimates the residual return on the trading day following each event under investigation.  The statistical significance of the residual return is typically assessed by calculating a standardized measure of the size of the residual return known as a "t-statistic."[4]  The t-statistic is calculated as the residual return divided by the standard error of the regression.  Professor Feinstein uses the critical t-statistic value of +/- 1.97 to determine whether a residual return is statistically significant at the 95 percent confidence level, i.e., the t-statistic must be at least 1.97 or must be -1.97 or below; otherwise, random chance as the explanation for the residual return cannot be rejected.  Feinstein Declaration n. 37.

17.    Lead Plaintiff claims that at least three of the alleged false and misleading statements were "positive" (Complaint ¶ 26) and allegedly caused artificial inflation in Baxter's stock price.  More specifically, and as already noted *supra* ¶ 8, Lead Plaintiff claims that alleged false and misleading statements on June 10, 2009, July 16, 2009, and September 16, 2009 caused Baxter's stock price to

---

3.    *See, e.g.,* A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997), 13-39 (stating: "The most common [estimation window] choice, when feasible, is using the period prior to the event window for the estimation window.") *and* J.J. Binder, "The Event Study Methodology Since 1969," 11 *Review of Quantitative Finance and Accounting* (1998), 111-137 (stating: "Studies with daily data tend to use about one year of observations, essentially 250 trading days.")

4.    *See, e.g.*, A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997), 13-39 *and* G.W. Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *The Journal of Law and Economics* (1981), 121- 57.

increase on June 11, 2009, July 16, 2009, and September 17, 2009. Consequently, I utilize my event study to test whether these alleged false and misleading statements can be associated with statistically significant and positive residual returns on these three dates and thus meet the first step of exhibiting a price impact.

       B.    <u>June 10, 2009</u>

18.    On June 10, 2009 (the first day of the Class Period), Lead Plaintiff alleges that Defendants made false and misleading statements when they spoke at the William Blair & Company Growth Stock Conference. Complaint ¶ 198. Baxter's presentation took place in the morning of June 10, 2009 and *Bloomberg* published the transcript of the presentation – including the alleged misstatements[5] – at 12:21 pm on this date. *See* Exhibit 3. However, Lead Plaintiff ignores the price change on June 10, 2009 and claims that the stock price did not react to the statements in the presentation until June 11, 2009, one day *after* the Class Period begins. Ignoring the price movement on June 10, 2009 is contrary to Professor Feinstein's opinion that Baxter stock traded in an efficient market, i.e., one "in which available information is rapidly incorporated into the prices of securities" (Feinstein Declaration ¶ 26) and furthermore is contrary to the fact that Professor Feinstein's event study analyzes the stock price reaction only on the same day on which the

---

5.    Baxter's presentation also included myriad information that was unrelated to the alleged false and misleading statements. *See* Exhibit 3.

information was disclosed. *Id.* ¶¶ 102, 106, 110, 113. As shown in Exhibit 4, the residual return on June 10, 2009 was *negative* 0.46 percent with a t-statistic of negative 0.35 and therefore the June 10 statements cannot be associated with a statistically significant price increase as Lead Plaintiff claims on that date.

19.     Even if, for some reason, the supposedly efficient market in which Baxter's stock traded took two days to incorporate the alleged false and misleading statements into the stock's price, my event study shows that the two-day residual return (i.e., the cumulative residual return over June 10, 2009 and June 11, 2009) was 1.86 percent with a t-statistic of 0.99, which does not meet the critical threshold of 1.97 and so the two-day residual return is not statistically significant. *See* Exhibit 5.

20.     Moreover, although Professor Feinstein did not analyze the price impact of the alleged false and misleading statements on June 10, 2009 in his declaration, I replicated his analysis and included this date along with the other dates of false and misleading statements he ignored.[6] As shown in Exhibits 4 and 5, Professor Feinstein's own event study analysis contradicts Lead Plaintiff's claims because on both a one-day and two-day basis, the residual returns from his regression model

---

6.     I find substantially similar results if I instead calculate the residual returns and t-statistics using the output from the market model Professor Feinstein presents as Exhibit 7 to his declaration.

following the June 10, 2009 alleged misstatements also are not statistically significant.[7]

C.   July 16, 2009

21.   On July 16, 2009, Baxter issued a press release announcing financial results for the second quarter of 2009 and raised its full-year 2009 guidance. Complaint ¶ 204. That same day, Baxter conducted an investor call. *Id.* ¶ 205. The press release was published before the market opened on July 16, 2009 and *Bloomberg* published the transcript of the subsequent conference call at 9:45 AM on that date. *See* Exhibits 8 & 9. Lead Plaintiff claims that the Defendants made alleged false and misleading statements regarding Baxter's plasma market prospects. Complaint ¶¶ 204-16. My event study finds that the residual return on July 16, 2009 was 2.50% with a t-statistic of 1.82, which does not meet the critical threshold of 1.97 and so the residual return is not statistically significant.

22.   Professor Feinstein opines that the residual return on July 16, 2009 "is associated with a *t*-statistic value of 2.48, which indicates that the residual return

---

7.   On its own, the residual return on June 11, 2009 is statistically significant and positive. However, the price increase on June 11, 2009 was associated with news unrelated to the alleged false and misleading statements on June 10, 2009. Specifically, as *Dow Jones Chinese Financial Wire* reported on June 11, 2009, "Vaccine-maker Baxter International Inc. (BAX, $48.13, +$1.72, +3.71%) climbed after the World Health Organization raised the H1N1 pandemic flu alert to 6." *See* Exhibit 6. According to *International Business Times,* the stock prices of Glaxo, Sanofi, and Novartis also increased on this date due to the same news. *See* Exhibit 7. Such attribution by contemporaneous market participants of the price increases of Baxter and competitors to information unrelated to the alleged fraud provides additional evidence that there is no reliable basis to associate the alleged false and misleading statements on June 10, 2009 with a price impact following their disclosure.

was too severe to have been a random fluctuation." Feinstein Declaration ¶ 103. But, as demonstrated by my analysis, his conclusion is not robust. By simply using a different and commonly employed estimation period, my analysis results in the opposite conclusion. Consequently, Professor Feinstein's calculation of the t-statistic on July 16, 2009 is not reliable.

23. Moreover, even if his calculation was reliable, Professor Feinstein contradicts Lead Plaintiff's claim that alleged false and misleading statements were the cause of any price increase on this date. Professor Feinstein opines that "the price of Baxter stock increased in response to the better-than-expected quarterly EPS and earnings guidance released that morning." *Id.* ¶ 104. However, Lead Plaintiff does not allege that Baxter's reported EPS for the second quarter of 2009 were false or that Baxter failed to achieve the raised 2009 guidance it issued on July 16, 2009. In addition, both Lead Plaintiff and Professor Feinstein ignore the fact that many analysts focused on the Defendants' discussion of swine flu sales, which are unrelated to the alleged false and misleading statements. For example, in a report titled "2Q09: Who Cares About Plasma Pricing When There's Swine Flu Vaccine?," analysts at Credit Suisse stated "Plasma now takes a back seat" and "All about the swine. Call focused on H1N1 (swine flu) vaccine." *See* Exhibit 10. In addition, of the $0.14 increase in Morgan Stanley analysts' 2010 EPS estimate, $0.11 was from swine flu and $0.03 was from a lower share count. *See* Exhibit 11.

These analysts stated that "Baxter's strong outlook for swine flu provides a near-term catalyst and bridge to 2H10 when we expect the company to begin to reap the benefits of its extended investment cycle in R&D and capex." *See id.* Finally, although Lead Plaintiff claims that "[m]arket analysts were clearly swayed by Defendants' false and misleading statements" (Complaint ¶ 216), the J.P. Morgan and William Blair & Company analysts cited in the Complaint did not increase their EPS estimates for FY2010 and *reduced* their estimates for 3Q09.[8] *See* Exhibit 12 & *compare* Exhibit 13 *with* Exhibit 14.

D. September 17, 2009

24. On September 16, 2009, Baxter hosted an investor conference. Complaint ¶ 220. At 8:00 AM, before the market opened on this date, the Company issued a press release that contains some of the statements cited in the Complaint, in particular the increase in Baxter's revenue growth rate. *Compare id.* ¶ 220 *with* Exhibit 15. The conference had an accompanying live webcast beginning at 9:00 AM on September 16, 2009. *See id.* The transcript of the conference call shows that all of the alleged misstatements regarding the Company's plasma prospects were made well before the lunch break at 1:10 PM. *See* Exhibit 16 at 3, 7, 9, 21, 25, 26 (statements related to plasma in Complaint ¶¶ 220-222) & 52-53 (stating

---

8. The J.P. Morgan analysts also decreased their 4Q09 estimate and the William Blair and Company analysts increased their 4Q09 estimate but, other than increasing the FY2009 estimate for the better-than-expected 2Q09 results, did not change their FY2009 estimate. *See* Exhibit 12 & *compare* Exhibit 13 *with* Exhibit 14.

that participants would "reconvene sharply at 1 o'clock [Central Time]," which will be "in 50 minutes.").

25.     Neither my nor Professor Feinstein's event study finds a statistically significant residual return on September 16, 2009.  *See* Exhibit 4.  However, as with June 10, 2009, Lead Plaintiff ignores the stock price change on the date of the alleged false and misleading statements and instead attributes the price increase on September 17, 2009 to the statements made on the prior day.  This is inconsistent with Professor Feinstein's own focus in his declaration on price reactions on the same day on which the information was disclosed (in the context of assessing the efficiency of the market in which Baxter stock traded).[9]

26.     Further, the alleged false and misleading statements regarding the Colleague pump remediation disclosed on September 16, 2009 – that Baxter had "remediated well over 100,000 devices in the U.S." and continued to work with the FDA – was not new information but had previously been disclosed on January 22, 2009. *Compare* Complaint ¶ 224 *with* Exhibit 19 at 3 ("We've now remediated more than

---

9.     Although the two-day residual return in Baxter's stock price on September 16-17, 2009 is statistically significant and positive (*see* Exhibit 5), Lead Plaintiff ignores that market participants attributed this return to the Company's swine flu vaccine opportunity, which is unrelated to the alleged false and misleading statements.  For example, *Interactive Brokers* reported at 12:38 PM on September 17, 2009 that Baxter "saw its share price rally to a fresh 52-week peak one day after announcing improved yields on its [swine flu] vaccine." *See* Exhibit 17. Further, analysts discussed the vaccines business in detail on this date.  For example, J.P. Morgan analysts stated in a report issued on September 17, 2009:  "The Vaccines business is worth expounding on. … The ramp [in production of Baxter's H1N1 vaccine] since the 2Q call means that Baxter will almost certainly exceed 2H guidance for vaccines, which at the time of the call assumed low yields and a very limited contribution from H1N1." *See* Exhibit 18.

100,000 of the COLLEAGUE single channel pumps and continue to be in active dialogue with the FDA."). All other alleged misstatements regarding the Colleague pump were made before the 1:10 PM lunch break. *Compare* Complaint ¶ 223 *with* Exhibit 16 at 37 & 38. For all of the reasons explained above, there is no reliable basis to associate the increase in Baxter's stock price on September 17, 2009 with the alleged false and misleading statements made on the prior day.

        E.    Dates Following All Other Alleged False and Misleading Statements

27. I next turn to the alleged false and misleading statements that Lead Plaintiff does not explicitly associate with increases in Baxter's stock price. As shown in Exhibits 4 & 5, only two of the other eight dates on which alleged false and misleading statements occurred could be associated with a statistically significant residual return, but none of these returns are positive in either my or Professor Feinstein's event studies. Therefore, there is no reliable basis from this event study analysis to associate the alleged positive false and misleading statements on any of these eight dates with a price impact following their disclosure.

**IV. There Is No Reliable Basis to Conclude that the Price Movements on the Alleged Corrective Disclosure Dates Are a Measure of the Price Impact of the Alleged False and Misleading Statements**

28. Lead Plaintiff claims that the falsity of Defendants' alleged misstatements was revealed to the market on April 22, 2010 and May 3, 2010. Complaint ¶¶ 12-

15.   In other words, Lead Plaintiff asserts that the price declines following the alleged corrective disclosures can be used to measure the price impact of the alleged false and misleading statements.

29.   However, the reaction in Baxter's stock price to the alleged corrective disclosures can be used to measure the price impact of the alleged false and misleading statements only if the information contained in the alleged corrective disclosure could have been disclosed at the time the earlier alleged misstatements were made.  This is well understood in the academic literature.[10]  For example, the Defendants could not have disclosed the FDA's recall decision prior to its occurrence because they do not directly control the FDA's actions.   If the disclosure of the actual recall could not have occurred any earlier, the statistically significant residual decline in Baxter's stock price on May 4, 2010 reflects the timely reaction by investors to new information (the actual recall) and cannot be used as a proxy to measure the price impact of the alleged false and misleading statements regarding the Colleague pump.

30.   Similarly, I understand that the disclosure of the reduction to Baxter's 2010 guidance could not have been made at the beginning of the Class Period.  And if the reduced 2010 guidance could not have been disclosed prior to April 22, 2010

---

10.   *See*, e.g., B. Cornell & R.G. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA Law Review* (June 1990), 883-924 and F.A. Ferrell & A. Saha, "The Loss Causation Requirement for Rule 10b-5 Causes of Action:  The Implications of *Dura Pharmaceuticals v. Broudo*," 63 *Business Lawyer* (November 2007), 163-186.

(which I understand Defendants contend to be the case), the statistically significant residual decline in Baxter's stock price on April 22, 2010 reflects the timely reaction by investors to new information and cannot be used as a proxy for the price impact of the alleged false and misleading statements regarding the plasma market guidance.

31. Finally, it is worth noting that Lead Plaintiff ignores the fact that the guidance revision was in part attributed to the impact of the U.S. healthcare reform on Baxter's FY2010 EPS estimates disclosed on the same day, which is unrelated to the alleged false and misleading statements. *See supra* ¶ 6. Baxter ascribed $0.10 of the $0.28 FY2010 EPS estimate reduction – or about 36 percent – to healthcare reform. *See* Exhibit 20. The impact of the healthcare reform on the Company's stock price is evidenced by market commentary following the April 22, 2010 disclosures. For example, on the same day, *Bloomberg News* reported: "Baxter International Inc. plunged the most in seven years after the company cut its 2010 earnings forecast on costs from the U.S. health-care overhaul." *See* Exhibit 21. Further, some analysts reduced their EPS estimates for FY2010 in part due to healthcare reform. *See*, e.g., Exhibit 22 (a Morgan Keegan report dated April 23, 2010 that states: "We are lowering our revenue estimate for 2010 by $0.4 billion to $13.1 billion primarily due to lower antibody therapy revenues, and the impact of healthcare reform.").

32.     For the reasons provided above, I therefore conclude there is no reliable basis to conclude that the price movements on the alleged corrective disclosure dates are a measure of the price impact of the alleged false and misleading statements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2014.

_____
                    Allen Ferrell

## CERTIFICATE OF SERVICE

Matthew R. Kipp, an attorney, hereby certifies that on July 25, 2014, he served true and correct copies of the foregoing Defendants' Supplemental Brief in Opposition to Class Certification, Appendix of Exhibits Cited in Defendants' Supplemental Brief in Opposition to Class Certification, Declaration of Professor Allen Ferrell, and Appendix of Exhibits Cited in Declaration of Professor Allen Ferrell via this Court's ECF filing system on the following counsel of record:

David J. George, Esq.
Robert J. Robbins, Esq.
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL   33432

Marvin A. Miller, Esq.
Lori A. Fanning, Esq.
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL   60603

*/s/ Matthew R. Kipp*
Matthew R. Kipp