UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LAKELAND EMPLOYEES PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:10-cv-06016 |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | Assigned to: Judge John J. Tharp, Jr. |
| vs. | ) | |
| | ) | |
| BAXTER INTERNATIONAL INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF ROBERT J. ROBBINS IN SUPPORT OF MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF
SETTLEMENT PROCEEDS, AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ......................................................................................1

II. HISTORY OF THE LITIGATION ..............................................................................4

    A. Background and Defendants' Alleged Wrongful Conduct ......................................4

        1. Baxter' Colleague Pump ..............................................................................5

        2. Baxter's Plasma Business ............................................................................7

    B. Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel and Liaison Counsel...........................................................................9

    C. Defendants' Motion to Dismiss ...........................................................................10

    D. The Parties' Discovery Efforts..............................................................................11

        1. Negotiations Over Contours of Production................................................11

        2. Document Discovery ..................................................................................13

            a. Lead Plaintiff's Production ............................................................13

            b. Defendants' Production ..................................................................13

            c. Third-Party Productions..................................................................13

        3. Lead Plaintiff's Preparation for Depositions of Baxter Personnel and Related Third-Parties .......................................................................14

    E. Lead Plaintiff's Motion for Class Certification & Price Impact Briefing ............15

    F. Expert Discovery ..................................................................................................16

III. SETTLEMENT..........................................................................................................17

    A. Settlement Negotiations........................................................................................17

    B. Analysis of the Factors Affecting Settlement ......................................................17

        1. The Strength of Lead Plaintiff's Case Compared to the Settlement Amount ......................................................................................................18

            a. Risks Concerning Defendants' Alleged False Statements.............18

            b. Risks of Proving Scienter................................................................19

- i -

|  |  | c. | Risks of Proving Loss Causation and Damages | 20 |
|---|---|---|---|---|
|  |  | d. | Possible Range of Recovery | 21 |
|  | 2. | | The Complexity, Length, and Expense of Further Litigation | 22 |
|  | 3. | | Opposition to the Settlement and the Reaction of the Class | 22 |
|  | 4. | | Opinions of Counsel | 22 |
|  | 5. | | The Stage of the Proceedings and Amount of Discovery Completed | 23 |
| C. | | | Mailing and Publication of Notice of Settlement | 24 |
| IV. | | | THE PLAN OF ALLOCATION | 24 |
| V. | | | ATTORNEYS' FEES AND EXPENSES | 26 |
| VI. | | | CONCLUSION | 29 |

I, ROBERT J. ROBBINS, declare as follows pursuant to 28 U.S.C. §1746:

## I.     PRELIMINARY STATEMENT

1.      I, Robert J. Robbins, am a member of the bar of the State of Florida and have been admitted to appear *pro hac vice* before this Court in the above-captioned action ("Action").[1]  I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), counsel for Court-appointed Lead Plaintiff National Elevator Industry Pension Fund ("Lead Plaintiff" or "National Elevator").  I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of and participation in all material aspects of the litigation.

2.      I respectfully submit this declaration in support of the motion by Lead Plaintiff, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for: (a) final approval of the proposed $42.5 million settlement (the "Settlement"); (b) approval of the proposed plan for allocating the proceeds of the Settlement to eligible Class Members (the "Plan of Allocation"); and (c) approval of Lead Counsel's application for an award of attorneys' fees and expenses.  The Settlement will resolve all claims asserted in the Action against Defendants[2] on behalf of a class (the "Class") that consists of: all Persons who purchased or otherwise acquired Baxter common stock during the period from June 10, 2009 through and including May 3, 2010 (the "Class Period").[3]  The

---

[1]     Capitalized terms not otherwise defined herein have the meaning as set forth and defined in the Amended Settlement Agreement, dated August 27, 2015 (the "Settlement Agreement").  Dkt. No. 292.

[2]     Defendants are Baxter International Inc. ("Baxter" or the "Company"), Chief Executive Officer Robert L. Parkinson, Jr. ("Parkinson"), Chief Financial Officer Robert M. Davis ("Davis"), and Corporate Vice President of Investor Relations Mary Kay Ladone ("Ladone").  Parkinson, Davis, and Ladone are referred to as the "Individual Defendants."  Baxter and the Individual Defendants are collectively referred to as "Defendants."

[3]     Excluded from the Class are: (i) Defendants; (ii) the officers and directors of Baxter during the Class Period; (iii) members of the immediate families of any excluded person; (iv) the legal representatives, heirs, successors or assigns of any excluded person; (v) any entity in which any Defendant has or had a controlling interest; and (vi) any Person who would otherwise be a Class Member but who properly excludes himself,

Court preliminarily approved the Settlement by an Order entered on September 18, 2015 (the "Preliminary Approval Order"). Dkt. No. 293. To date, there have been no objections to any aspect of the Settlement, including the Plan of Allocation and Lead Counsel's request for attorneys' fees and expenses, and only six requests for exclusion have been submitted by purported Class Members.

3.      The purpose of this declaration is to set forth the basis for and background of the Action, its procedural history, the efforts of counsel, the risk of continued litigation, and the negotiations that led to the Settlement. This declaration demonstrates why the Settlement is fair, reasonable, and adequate and should be approved by the Court, why the Plan of Allocation is fair, reasonable, and adequate, and why the application for attorneys' fees and expenses is reasonable and should be approved by the Court.

4.      The Settlement is for $42,500,000.00 in cash and any interest accrued thereon (the "Settlement Fund").

5.      The Settlement is an excellent result, particularly when considered in light of the substantial risks to Lead Plaintiff in continuing the Action. Indeed, as set forth below, there were substantial risks that Lead Plaintiff would not have been able to obtain a meaningful recovery for the Class and that even if it ultimately prevailed on the merits of its claims, any judgment would inevitably be subject to appeal with the risk of reversal. Defendants' defenses presented numerous risks concerning Lead Plaintiff's ability to prove liability and the amount of damages suffered by Lead Plaintiff and the Class.

6.      Despite these obstacles, Lead Counsel obtained a highly favorable settlement that will result in a recovery for Class Members in the near future instead of having to wait many more years with no guarantee of any recovery. In sum, the Settlement confers an immediate benefit on the Class

---

herself, or itself by filing a valid and timely request for exclusion in accordance with the requirements set for in the Notice.

and eliminates the risk of continued litigation under circumstances where a favorable outcome could not be assured.

7.     Settlement with Defendants was reached only after Lead Counsel: (a) conducted an extensive investigation into the underlying facts; (b) thoroughly researched the law pertinent to the Class Members' claims and Defendants' defenses; (c) prepared and filed the detailed Amended Consolidated Class Action Complaint ("Amended Complaint") specifying Defendants' violations of the federal securities laws; (d) successfully opposed Defendants' motion to dismiss the Amended Complaint and subsequent interlocutory appeal pursuant to 28 U.S.C. §1292(b); (e) conducted extensive fact discovery, including defending the deposition of Lead Plaintiff and reviewing and producing thousands of pages of document discovery on Lead Plaintiff's behalf; (f) engaged in exhaustive expert discovery that involved both class certification and merits issues; (g) conducted broad merits discovery, which included the pursuit of third-party discovery from the U.S. Food and Drug Administration ("FDA") amongst others, extensive negotiations with Defendants concerning the contours of their document production, review and analysis of millions of pages of document discovery from Defendants, exchange of multiple sets of interrogatories, and preparation for depositions of 27 fact witnesses; (h) briefed Defendants' motion to compel documents from Lead Plaintiff and Lead Plaintiff's two non-testifying consultants; (i) prepared Lead Plaintiff's motion for class certification; (j) prepared additional briefing in support of class certification on the issue of price impact; (k) prepared an in-depth mediation statement that analyzed the merits of Lead Plaintiff's claims and the defenses available to Defendants; and (l) consulted with experts to fully evaluate the strength of Lead Plaintiff's claims and Defendants' defenses.  The parties ultimately entered into settlement negotiations, which were protracted and at arm's length, and included an extensive in-person mediation session before the Honorable Layn R. Phillips (Ret.), as well as

subsequent settlement discussions by telephone and email, which were further mediated by Judge Phillips. The Settlement was reached at a time when Lead Counsel and Lead Plaintiff were fully cognizant of the strengths and weaknesses of the case, and the risks of continued litigation.

8.     For creating this benefit, Lead Counsel seeks a fee of 26% of the Settlement Fund, plus payment of expenses incurred in the successful prosecution of this Action. The requested attorneys' fees are consistent with awards made in common fund cases generally, and in other securities cases across the country. The fee was negotiated between Lead Plaintiff (with the assistance of its counsel) and Robbins Geller. Importantly, the Notice of Pendency of Class Action and Proposed Settlement, Motion for Attorneys' Fees and Settlement Fairness Hearing ("Notice") advised Class Members that Lead Counsel would seek a fee of up to 26% and, to date, we are not aware of a single objection.

9.     Accordingly, it is respectfully submitted that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate, and counsel for Lead Plaintiff should be awarded attorneys' fees of 26% of the Settlement Fund and payment of expenses in the amount of $1,130,589.20.

## II.     HISTORY OF THE LITIGATION

### A.     Background and Defendants' Alleged Wrongful Conduct

10.     Baxter is a global healthcare company that develops, manufactures, and markets a variety of healthcare products, including medical devices and plasma-derived therapeutic protein products. ¶55.[4] During the Class Period, Baxter operated three segments, two of which are relevant to this litigation: BioScience and Medication Delivery. ¶56. In 2009, Baxter's BioScience segment, which includes the Company's plasma-derivative products business, generated $5.6 billion in sales,

---

[4]     Paragraph references ("¶__") are to the Amended Complaint, unless otherwise stated.

and the Medication Delivery segment, which includes global infusion systems and the Colleague Volumetric Infusion Pump (the "Colleague"), generated $4.65 billion in sales, accounting for 45% and 37%, respectively, of the Company's sales.  ¶¶56-57.

### 1. Baxter' Colleague Pump

11.     The Colleague is a medical device intended to deliver intravenous fluids and medications to patients in hospitals, outpatient surgical centers, clinics, nursing homes, and ambulances.  ¶59.  Released to the market in 1997, the Colleague – available in triple- or single-channel models – quickly became the leading infusion pump.  ¶¶59-60.  Following numerous design, user interface, and battery deficiencies, the Colleague came under FDA scrutiny in 1999.  ¶60.

12.     In June 2005, as a result of multiple Class I recalls, representatives from the FDA inspected Baxter's Round Lake, Illinois facility and determined that the Company's Colleague pumps were adulterated and misbranded under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§351(c), 351(h), and 352(t)(2).  ¶¶61-63.  This inspection led to the United States filing a complaint in the Northern District of Illinois on October 12, 2005, and two separate seizures of Colleague infusion pumps at Baxter's and Cardinal Health's facilities.  ¶63.  Around the same time, the Company voluntarily ceased all domestic sales and shipments of the Colleague in response to a February 2005 letter from the FDA concerning damage to the Colleague batteries, which rendered the pumps incapable of operating properly.  ¶62.

13.     On June 29, 2006, Baxter, Parkinson, and President of Medication Delivery Services Peter Arduini ("Arduini") signed the Consent Decree, which permanently enjoined Baxter from "manufacturing, processing, packing, repacking, labeling, distributing, or importing into the United States any model or components" for its Colleague pumps.  ¶64.  As a result, Baxter was required to stop manufacturing or distributing any infusion pumps sharing certain components or devices in common with the Colleague, including software systems, computer motherboards, processors,

- 5 -

sensors, timing circuitry, power systems, and pumping mechanisms. *Id.* The Consent Decree required Baxter and Parkinson to provide the FDA with written notice as to how the Company would remediate the Colleague and mandated that the Company receive written FDA authorization prior to actually remediating Colleague devices. *Id.* The Consent Decree further required Baxter and Parkinson to submit a Corrective Action Plan ("CAP") to bring the Company's Colleague pumps in the field into compliance with the FDA's regulations and the Consent Decree. ¶67.

14.    Moreover, the Consent Decree covered the Company's quality systems and related procedures that the FDA found to be lax or inadequate. ¶65. It required Baxter to retain an independent expert to conduct inspections of Baxter's facilities, and to review and determine whether the Company's methods, facilities, and controls were operated and administered in conformity with FDA quality system regulations, 21 U.S.C. §351(h), 21 C.F.R. Part 820 ("Part 820"), 21 U.S.C. §352(t)(2), and the Consent Decree. ¶¶66, 80.

15.    Lead Plaintiff alleges that Defendants knowingly or with severe recklessness made material misrepresentations and/or failed to disclose facts concerning the true status of remediation of the Company's Colleague pumps. More specifically, Lead Plaintiff alleges that Defendants failed to disclose that Baxter was: (i) not complying with the terms of the June 2006 Consent Decree entered into with the FDA (¶¶71, 123); (ii) unable to complete remediation of the Colleague in a timeframe acceptable to the FDA (¶¶77, 88, 113, 118); (iii) unwilling to allocate the necessary resources to remediate the Colleague pump until it was too late (¶¶131-149); (iv) required to conduct a clinical trial on the remediated Colleague, which would significantly extend the remediation timeline (¶¶78, 81); (v) incapable of getting FDA clearance for a remediated Colleague, or even submitting the necessary 510(k) submission, without clinical data (¶¶78-79, 122); (vi) suffering from critical quality control failures such that it was not compliant with the necessary quality system

- 6 -

regulations, such as Part 820 (¶¶110-111, 117); and (vii) no longer in a position of trust and credibility with the FDA due to repeated failures of the Colleague, including failures on "remediated" Colleague devices, and the Company's inability to understand the root causes of why the Colleague continued to malfunction (¶¶75, 88, 120, 125).

16.     Lead Plaintiff alleges the truth was revealed on May 3, 2010, when Baxter disclosed that the FDA had ordered it to not only recall, but destroy all Colleague pumps in the United States. ¶¶274-275.  Baxter also announced that it anticipated taking a $400-$600 million special charge in the first quarter of 2010.  ¶274.  In response to the FDA's unprecedented action, the price of Baxter stock dropped $2.42 per share, or roughly 5%, to close at $45.08 per share on May 4, 2010, on unusually heavy trading volume.  ¶277.

### 2.     Baxter's Plasma Business

17.     Baxter's BioScience business manufactures, among other things, recombinant and plasma-based proteins to treat hemophilia and other bleeding disorders, and plasma-based therapies to treat immune deficiencies.  ¶161.  The manufacturing process for plasma-derivative products involves: (i) plasma collection; (ii) plasma testing; (iii) fractioning (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.); (iv) finishing or purification; (v) quality control; and (vi) lot release.  The time required to complete the full manufacturing process ranges from seven months to a year.  ¶162.  Baxter's plasma-derivative products are usually purchased by hospitals through contracts negotiated by Group Purchasing Organizations ("GPO") at very high prices to make essential treatments available to critically ill patients.  The result is that small changes in production levels cause dramatic swings in prices for products, and producers stand to increase profits greatly by controlling output relative to demand.  It is, therefore, of utmost importance to maintain competition in the industry so that there is ample supply of plasma-derivative products and the products remain fairly priced.  ¶164.

18.     Prior to 2008, demand for plasma-derivative products in the United States exceeded available plasma supply, *i.e.*, plasma was considered "constrained." As a result, Baxter had only a few weeks of plasma inventory on-hand, the Company was able to sell at a price premium each liter of plasma it fractionated, and the Company had no need to actively market its plasma-derivative products. During this time, Baxter also experienced a boost in market share and gross profit margins due to the failed merger of two key competitors, CSL Limited ("CSL") and Talecris Biotherapeutics Holdings Corporation ("Talecris"). ¶165.

19.     However, beginning in mid-2008, the U.S. plasma market changed dramatically. Plasma went from being constrained to a state of equilibrium, where supply equaled demand. Baxter anticipated that by mid-2009, the plasma market would be unconstrained, with plasma supply exceeding demand. Baxter was aware of the change in outlook for the plasma business as early as August 2008. Despite Baxter's early recognition of the forecasted increase in plasma supply and the excess plasma supply that existed in 2009 and 2010, Defendants' public mantra throughout the Class Period was that the outlook for Baxter's plasma business had not changed. *See*, *e.g.*, ¶¶198, 208, 229, 233-234, 259.

20.     Lead Plaintiff alleges that during the Class Period, Defendants issued materially false and misleading statements concerning the state of and outlook for the Company's plasma business and failed to disclose that: (i) the boost in market share and gross profit margins that Baxter experienced in its plasma business following the failed merger of CSL and Talecris was only temporary and that the Company would be unable to sustain the financial benefits it had received (¶¶202, 218); (ii) Baxter was intentionally, but not successfully, trying to reduce blood plasma collections in an attempt to maintain a plasma supply shortage and support the Company's high pricing for its plasma-derivative products (¶¶188-196, 202, 238); (iii) due to loss of market share,

- 8 -

declining demand in the United States, increased plasma supply and inventories, and pricing pressures for Baxter's key plasma-derivative products, revenue guidance for its BioScience and plasma-derivative products business lacked a reasonable basis when made (¶¶218, 238, 242); and (iv) in light of the foregoing, Baxter's BioScience long-range plan, which included revenue growth of 7% to 9%, including 10% for its plasma business, was unreasonable and misleading (¶¶218, 242, 258).

21.     On April 22, 2010, the Company reported its first quarter 2010 financial results and lowered its revenue and earnings outlook for full-year 2010.  ¶¶12, 263.  Defendants revealed, contrary to their statements throughout the Class Period, that due to continuing pressures in Baxter's critical plasma-derivative products business, including a loss in market share, the Company was reducing its revenue guidance for full-year 2010, to revenue growth in the range of 1% to 3%, down from a previous range of 5% to 7%.  *Id.*  The Amended Complaint alleges the price of Baxter stock declined as a result of Defendants' disclosures.  ¶¶12-13, 292.

**B.     Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel and Liaison Counsel**

22.     The initial complaint in this Action was filed on September 21, 2010 [Dkt. No. 1], alleging, among other things, that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  The Action was originally assigned to the Honorable Sharon Johnson Coleman.

23.     By an Order dated November 30, 2010, the Court appointed National Elevator as Lead Plaintiff, Robbins Geller as Lead Counsel, and Miller Law LLC as Liaison Counsel.  Dkt. No. 40.  On January 28, 2011, Lead Plaintiff filed its consolidated class action complaint [Dkt. No. 65] and on April 15, 2011, Lead Plaintiff filed its Amended Complaint [Dkt. No. 74].

24.      Lead Counsel conducted an intensive pre-filing investigation to ensure that the allegations would satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Lead Counsel thoroughly reviewed and analyzed a significant amount of relevant publicly available information regarding the Company, including, but not limited to, its U.S. Securities and Exchange Commission ("SEC") filings, press releases, and securities analysts' reports about Baxter.  Considerable resources were also devoted to uncovering and attempting to uncover non-public information, including interviewing former employees of Baxter.

### C.      Defendants' Motion to Dismiss

25.      On May 27, 2011, Defendants filed their motion to dismiss the Action, asserting that Lead Plaintiff's Amended Complaint failed to state a claim for relief.  Dkt. Nos. 77-79.  Defendants mainly challenged the sufficiency of Lead Plaintiff's allegations regarding Defendants' scienter and the falsity of Defendants' Class Period statements.  *Id.*  On July 21, 2011, Lead Plaintiff filed its opposition [Dkt. No. 85] and Defendants filed their reply on August 11, 2011 [Dkt. No. 86].

26.      On January 23, 2012, Judge Coleman entered an Order granting in part, and denying in part, Defendants' motion to dismiss.  Dkt. No. 87.  The Order sustained the allegations in the Amended Complaint with one exception: statements "with respect to allegations that [Baxter] failed to disclose information related to the CSL and Talecris merger."  *Id.* at 5.  The Order, therefore, left intact claims and allegations that Defendants "failed to disclose that changes to [Baxter's] plasma collections combined with the changes to the market known to Baxter, assuming the facts to be true, [were] sufficient to undermine Baxter's argument that its positive sales projections had a reasonable basis."  *Id.*  Not one of Defendants' alleged false and misleading statements was dismissed from the Amended Complaint, nor were any of the three Individual Defendants.

- 10 -

27.     On February 17, 2012, Defendants filed a motion to certify an interlocutory appeal pursuant to 28 U.S.C. §1292(b) and a motion to stay the proceedings pending a decision [Dkt. Nos. 89-92], which were both granted over Lead Plaintiff's opposition [Dkt. No. 99]. On June 1, 2012, the Action was reassigned to the Honorable John J. Tharp, Jr. Dkt. No. 102. Following detailed briefing, on July 2, 2012, the Seventh Circuit Court of Appeals denied Defendants' petition for an interlocutory appeal. Dkt. No. 104.

### D.     The Parties' Discovery Efforts

28.     Following the Seventh Circuit Court of Appeals' denial of Defendants' petition for an interlocutory appeal and a status conference on July 11, 2012, the parties promptly proceeded with discovery. During the July 11th status conference, the Court approved the terms of the Parties' Stipulated Case Management Order and resolved the two pending disputes, granting 20 fact depositions and 25 interrogatories per side. The Court entered the revised Stipulated Case Management Order on July 16, 2012. Dkt. No. 111.

29.     The parties thereafter exchanged Rule 26(a)(1) initial disclosures on August 27, 2012, the same day Defendants filed their answer and separate defenses to the Amended Complaint. Dkt. No. 116.

### 1.     Negotiations Over Contours of Production

30.     Counsel engaged in multiple telephonic meet-and-confer sessions and follow-up conversations to negotiate the contours of the parties' productions. During these discussions, the parties worked through numerous disputes over such details as: (i) the relevant time period for responsive documents to be produced by Defendants; (ii) the breadth of search terms to be used by Defendants in their production of electronically stored information ("ESI"), and whether agreed upon search terms required the use of accompanying connectors; (iii) the breadth of custodians whose ESI would be searched during the course of Defendants' production; (iv) the extent to which

Defendants would search for and produce responsive hard copy documents separate and apart from their ESI productions; and (v) the extent to which Defendants' counsel would undertake a manual review for privilege and/or responsiveness of all ESI search results prior to making production to Lead Plaintiff.

31.     Following Defendants' first wave of production in late 2012, the parties renewed their meet-and-confer efforts to address Lead Plaintiff's concern that there were deficiencies in Defendants' production.  During the early part of 2013, the parties discussed Lead Plaintiff's concerns over Defendants' delay in producing any responsive documents relating to the Colleague side of the litigation and Defendants' failure to produce responsive privilege logs.

32.     During this same time period, the parties also worked out agreements for other discovery matters such as the parties' respective discovery responses relating to Lead Plaintiff's motion for class certification, which was filed on January 28, 2013.  Dkt. Nos. 128-130.

33.     Additionally, Lead Counsel continued communications with the FDA regarding prior document requests served pursuant to the Freedom of Information Act ("FOIA").  Lead Counsel also served document subpoenas on nine third-parties (including competitors, consultants, and an analyst) and 14 former Baxter employees who were employed prior to and during the Class Period.

34.     In total, the parties' comprehensive discovery negotiations spanned months and required numerous telephonic meet-and-confer sessions, as well as frequent follow-up via email and written correspondence.  Lead Counsel worked tirelessly for many months to not only ensure that Lead Plaintiff ultimately received the wide-ranging discovery needed from Defendants and various third-parties to successfully prosecute its securities fraud claims, but also to rein in Defendants' discovery requests of Lead Plaintiff.

35.     By the close of fact discovery on August 29, 2014, Lead Plaintiff had served ten requests for production of documents and ESI, totaling hundreds of particularized requests for documents, five sets of interrogatories, and three requests for admissions totaling over a hundred specific requests for admissions.

### 2.     Document Discovery

#### a.     Lead Plaintiff's Production

36.     Lead Plaintiff produced over 10,000 pages of documents in response to Defendants' various document requests.  These documents included investment account statements, investment management agreements, investment consulting agreements, investment policy statements, and publicly available documents relating to Baxter that were reviewed by Lead Counsel in preparation for the filing of the three complaints.

#### b.     Defendants' Production

37.     Defendants produced more than 608,000 documents totaling over 3.7 million pages, which Lead Counsel has searched and reviewed.  Lead Counsel devoted a team of upwards of eight attorneys dedicated to reviewing and analyzing the millions of pages of documents produced. Defendants' documents ranged from simple email communications to highly detailed presentations and worksheets, each requiring careful review and consideration.

#### c.     Third-Party Productions

38.     Another 259,280 pages of documents were produced by various third-parties, which were used to assist Lead Counsel in proving its claims prior to settlement.

39.     In March 2011, Lead Counsel served the FDA with a FOIA request for documents concerning the FDA's Consent Decree against Baxter and for any communications with the Company relating to the Colleague pump.  In response, the FDA produced 1,227 pages of heavily redacted documents.  As the litigation progressed, Baxter also subpoenaed the FDA for documents

and received over 100,000 pages of responsive documents, which Lead Plaintiff also reviewed. To confirm that Lead Plaintiff received all responsive documents, Lead Counsel served the same subpoena on the FDA.

40.     Lead Plaintiff served document requests on two of Baxter's third-party auditors: QualityHub, Inc. and Paraxel International Corporation. In response, Lead Counsel received highly technical reports relevant to the Colleague side of the Action that required careful review.

41.     Lead Plaintiff also served a subpoena for documents on the Plasma Protein Therapeutics Association ("PPTA"), which was responsible for monitoring the plasma market and provided Baxter with historical information relevant to the Action. In response, the PPTA produced over 160,000 pages of documents, many of which were in spreadsheets with detailed industry information.

### 3.     Lead Plaintiff's Preparation for Depositions of Baxter Personnel and Related Third-Parties

42.     The parties disagreed from the outset of discovery on the number of fact depositions for each side. All fact discovery was originally to be completed by March 28, 2014 [Dkt. No. 112]; however, following Lead Plaintiff's review of Defendants' and third-party production, Lead Counsel moved the Court for leave to take a total of 40 fact depositions [Dkt. No. 164]. Defendants opposed the motion, stating Lead Plaintiff failed to demonstrate a "substantial need" to take an additional 20 depositions. Dkt. No. 167. Following a status conference held on November 13, 2013, the Court granted each side 35 fact depositions. Dkt. No. 169.

43.     Prior to the parties reaching agreement on the Settlement, Lead Counsel worked diligently in the preparation for and taking of 27 fact depositions. Lead Counsel was in the process of preparing for the depositions of the Individual Defendants, which were scheduled to be completed by August 15, 2015 and were to span two-days each, when the parties agreed to settle this Action.

- 14 -

Dkt. No. 261.  Lead Counsel deposed current and former Baxter employees, the owner of Baxter's third-party auditor QualityHub, and current and former employees of the FDA.

44.     Accordingly, until the day all Settlement terms were finalized, Lead Counsel continued to carefully prepare Lead Plaintiff's case for trial, which included preparation for summary judgment briefing before trial itself.

### E.     Lead Plaintiff's Motion for Class Certification & Price Impact Briefing

45.     On January 28, 2013, Lead Plaintiff filed its motion for class certification.  Dkt. Nos. 128-130.  Defendants undertook a deposition of Lead Plaintiff and certain of Lead Plaintiff's investment managers in connection with the motion.  The motion was fully briefed as of May 2013, and the parties continued to engage in fact discovery while class certification remained pending before the Court.

46.     Following the U.S. Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. ___, 134 S. Ct. 2398 (2014), class certification briefing was re-opened to address the limited issue of price impact.  The parties each submitted price impact briefs, along with expert reports, and conducted related discovery and expert depositions.  Dkt. Nos. 211-214, 238-239, 253-257.  The re-opened window of class certification briefing closed on December 12, 2014, and the parties were awaiting the Court's ruling at the time of settlement.

47.     Lead Plaintiff believes that the Court would have held that Defendants were unable to prove by a preponderance of the evidence that the fraud-on-the-market presumption of reliance had been rebutted with evidence that Defendants' fraud had zero impact on the price of Baxter stock.  In fact, rather than proving that the entire stock price declines on the two corrective disclosure dates of April 22, 2010 and May 3, 2010 were due to unrelated market forces or other information, Defendants' expert admitted that, at least in part, the declines were caused by the disclosure of

- 15 -

Baxter' specific, fraud-related information. Dkt. No. 238-1 at 329. Based on this concession, it was Lead Plaintiff's position that Defendants failed to establish the absence of any price impact, that Lead Plaintiff's presumption of reliance had not been rebutted, and that the Class could be certified without issue.

### F. Expert Discovery

48. On January 16, 2015, Lead Plaintiff served Defendants with its expert report on loss causation and damages in accordance with the operative scheduling order. Lead Plaintiff's expert, Professor Steven P. Feinstein, Ph.D., CFA, opined that investors who purchased Baxter common stock during the Class Period suffered losses as a result of the misrepresentations alleged in the Amended Complaint and the corrective disclosures that occurred on April 22, 2010 and May 3, 2010. Professor Feinstein based his conclusions, in part, on event study analysis, which considered and accounted for any potential confounding information and proved that the alleged misrepresentations and omissions caused the stock price decline and in turn investor losses. Professor Feinstein also quantified damages sustained on a per share basis as up to $8.41 depending on the time of the stock purchase and sale.

49. On March 20, 2015, Defendants served their rebuttal expert report prepared by Professor Allen Ferrell, Ph.D. In the report, Professor Ferrell analyzed Professor Feinstein's report and concluded that: (i) market participants were aware that Baxter stock was a risky investment with exposure to the plasma business and uncertainties concerning an FDA recall of the Colleague; (ii) there was no reliable basis for Lead Plaintiff to claim that Baxter's stock price was artificially inflated; and (iii) Professor Feinstein's estimates of the alleged artificial inflation in the price of Baxter stock during the Class Period and his estimate of damages per share were fundamentally flawed and unreliable.

50.     Lead Plaintiff's reply report was served on May 15, 2015, wherein Professor Feinstein found no basis for revising his previous findings and conclusions on loss causation and damages.   After both experts were deposed and responded to requests for production, expert discovery closed on June 16, 2015.

## III.    SETTLEMENT

### A.    Settlement Negotiations

51.     On March 12, 2015, the parties participated in a full-day mediation session with the Hon. Layn R. Phillips (Ret.) at defense counsel's offices in New York, New York.   Judge Phillips has extensive experience mediating complex class action litigations such as this Action.   Prior to the mediation, the parties exchanged detailed mediation statements and replies outlining the strengths and weaknesses in each side's case.   National Elevator attended and participated in all aspects of the mediation.   While the mediation session was unsuccessful, the parties continued to engage in settlement discussions, even as they continued litigating the Action.

52.     On July 6, 2015, the parties reached an agreement-in-principle to settle the Action.   In the succeeding weeks, the parties negotiated the terms of the final Settlement Agreement, the forms of notice to the Class, and other documents filed with the Settlement Agreement.

53.     On August 11, 2015, Lead Plaintiff filed its Unopposed Motion for Preliminary Approval of Class Action Settlement, along with a Settlement Agreement.  Dkt. Nos. 275-279.  Lead Plaintiff filed an Amended Settlement Agreement on September 16, 2015.  Dkt. No. 292.  The Court preliminary approved the Settlement by Order on September 18, 2015.  Dkt. No. 293.

### B.    Analysis of the Factors Affecting Settlement

54.     The pertinent criteria for evaluating the fairness and adequacy of a proposed class action settlement in this Circuit include the following: (i) the strength of plaintiff's case compared to the amount of the settlement; (ii) the complexity, length, and expense of further litigation; (iii) the

- 17 -

amount of opposition to the settlement; (iv) the reaction of members of the class to the settlement; (v) opinions of counsel; and (vi) the stage of the proceedings and amount of discovery completed. *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014).  Based on an analysis of these factors, the terms of the Settlement and Plan of Allocation before the Court are fair, reasonable, and adequate, and should be approved.

### 1. The Strength of Lead Plaintiff's Case Compared to the Settlement Amount

55.     The first factor, the strength of plaintiff's case compared to the amount of the settlement, fully supports approval of the Settlement.  While Lead Plaintiff remains confident in its ability to get a class certified in this Action, and to prove its claims and counter any affirmative defenses, when weighed against the immediate benefits of settlement, the risks of losing at trial or having the Action dismissed prior to trial indicate that the Settlement is in the best interests of the Class.  Indeed, Defendants raised numerous credible arguments throughout litigation of this Action, including that Lead Plaintiff will be unable to demonstrate falsity, scienter, and loss causation.

### a. Risks Concerning Defendants' Alleged False Statements

56.     Defendants claim that this was a case of fraud-by-hindsight and challenged the falsity of both "tiers" of Lead Plaintiff's allegations of Defendants' false statements and omissions.  With respect to the Colleague allegations, Defendants would have argued at trial that at all times the Company was attempting to comply with the terms of the Consent Decree and the FDA's additional request for a clinical evaluation.  Defendants would have further asserted that, contrary to Lead Plaintiff's allegations, Baxter kept investors informed about the status of the Company's remediation efforts, including the request for clinical data.

57.     Among other things, Lead Plaintiff was prepared to respond by arguing that the declaration and testimony of Timothy Ulatwoski, one of the highest-ranking FDA officials charged

with overseeing Baxter's Colleague remediation efforts, offered a damning critique of the Company's failed Colleague remediation and the falsity of Defendants' Class Period statements. Lead Plaintiff also contended that documentary evidence showed that Baxter was incapable of remediating the Colleague within a time period acceptable to the FDA and that the Company spent much of the Class Period attempting to convince the FDA that Baxter should not have to conduct a clinical trial prior to its 510(k) submission, even though Defendants have argued that they were at all times working to satisfy the clinical data requirement. Moreover, considering the Company was under Consent Decree, events related to the Colleague were undoubtedly material to investors. Therefore, Defendants had an obligation to keep the market fully informed.

58. Lead Plaintiff also expected Defendants to argue that Lead Plaintiff's plasma allegations had no merit because: (i) Baxter's Class Period statements about its long-term expectations for growth of its plasma-products business had a reasonable basis; (ii) Baxter's 2009 sales guidance for its BioScience segment and plasma-products business had a reasonable basis when issued on January 22, 2009, and also had a reasonable basis when Baxter raised its 2009 guidance on July 16, 2009; (iii) Baxter achieved its raised 2009 guidance; and (iv) Baxter's 2010 sales growth guidance for its BioScience segment and plasma-products business had a reasonable basis when issued on January 28, 2010.

59. Although Lead Plaintiff believed it could effectively respond to Defendants' arguments by arguing that Baxter's long-term and 2010 guidance misled the market, the outcome of any such battle over falsity was far from certain.

### b. Risks of Proving Scienter

60. Lead Plaintiff anticipated that Defendants would argue that Lead Plaintiff would not be able to prove Defendants made any false and misleading statements with the requisite scienter. In Defendants' view, the statements were truthful when made. Defendants would also seek to prove

- 19 -

that Lead Plaintiff failed to identify any motive for them to engage in a fraud of any sort to inflate Baxter's stock price. During the Class Period, none of the Individual Defendants sold Baxter stock, Baxter was not engaged in any corporate transactions in which its stock was used as a currency, and the Company was engaged in a stock repurchase program.

61.     While Lead Plaintiff was confident in the strength of the allegations in the Amended Complaint and the documents uncovered during discovery, there was a substantial risk if the case proceeded to trial that the jury could have sided with Defendants on the issue.

### c.     Risks of Proving Loss Causation and Damages

62.     Proving loss causation in securities fraud cases can be complex and frequently requires dueling expert testimony. Although Defendants failed to challenge loss causation at the motion to dismiss stage, Defendants aggressively challenged loss causation and damages during expert discovery. Defendants once again engaged Professor Ferrell to analyze the economic evidence as it related to Lead Plaintiff's claims in the Amended Complaint and Professor Feinstein's expert report. If this Action proceeded to summary judgment and trial, Defendants would argue that Lead Plaintiff's two corrective disclosures did not relate to the any of the alleged misstatements or omissions during the Class Period and, therefore, the stock drop was unrelated to the fraud. They would have further asserted that other information caused Baxter's stock to decline, that the weakening state of the plasma market was known to analysts and investors, that an unanticipated FDA recall cannot support loss causation, and that Professor Feinstein's damages attribution analysis could not sufficiently account for these confounding factors.

63.     Lead Plaintiff would have countered with the analysis of Professor Feinstein and the event study analytics he conducted. Using the regression analysis, Professor Feinstein determined the statistical relationship between the price of Baxter stock and the market and an industry index, and calculated the abnormal returns on the alleged fraud-related event days. Professor Feinstein

- 20 -

found both disclosure dates statistically significant. Professor Feinstein also took steps to disaggregate the alleged fraud from confounding factors.

64. Although Lead Plaintiff believed it had the more compelling arguments, the loss causation and damages "battle of the experts" could have impacted Lead Plaintiff's ability to establish damages at trial.

### d. Possible Range of Recovery

65. Although Lead Plaintiff believes that this is a meritorious case and that the Class would ultimately prevail in establishing both liability and damages, a number of factors made the outcome of the case uncertain. For instance, while Lead Plaintiff firmly believes the documentary evidence and testimonial evidence it intended to offer at trial fully supports its claims, there is no way of predicting which interpretations, inferences, or testimony a jury would accept. Further, Defendants have adamantly denied any culpability through the course of this litigation and were prepared to aggressively defend the case. If the jury found that Lead Plaintiff had not proved any element of its claims or sided with Defendants' defenses, the Class would recover nothing.

66. With respect to damages, Lead Plaintiff alleged that Defendants' false and misleading statements and omissions artificially inflated the price of Baxter stock until corrective disclosures were made on April 22, 2010 and May 3, 2010. During mediation, Defendants made it clear that their intention was to vigorously contest the amount of recoverable damages and the parties submitted briefs and engaged in lengthy discussions with Judge Phillips in order to better evaluate the issues of liability and damages. The Court is respectfully referred to the Amended Memorandum of Points and Authorities in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement [Dkt. No. 287] for additional discussion of the range of possible recovery.

## 2. The Complexity, Length, and Expense of Further Litigation

67.     The second factor – the complexity, length, and expense of further litigation – also militates in favor of this Settlement.  Securities class actions are extremely complex, time consuming, and expensive.  Indeed, this Action presented very complicated factual and legal issues.  Further litigation would result in substantial resources being expended to proceed through summary judgment, trial, and the post-trial appellate process without any guarantee of a better resolution for the Class.  And these expenditures would also serve to deplete any potential recovery at trial.  The Settlement avoids these expenditures and provides an immediate recovery for the Class.  Therefore, this factor favors the Settlement.

## 3. Opposition to the Settlement and the Reaction of the Class

68.     The third and fourth factors, the amount of opposition to the settlement, also militate in favor of the Settlement.  While the date for filing objections and submitting exclusions – December 18, 2015 – has not yet passed, approximately 392,700 Notices have already been disseminated to potential Class Members, yet, to date, no Class Members have objected to the Settlement and only six have requested exclusion from the Class.  Given this dearth of opposition, the attitude of the Class weighs in favor of the Settlement.

## 4. Opinions of Counsel

69.     The fifth factor, opinions of counsel, also supports the Settlement.  Lead Plaintiff's counsel have extensive experience and success in complex class action litigation, and in securities fraud litigation in particular.[5]  Likewise, Defendants' counsel has an abundance of experience in this type of litigation.  Based on this extensive experience, Lead Counsel has determined that the

---

[5]     *See* Declaration of Robert J. Robbins Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), Ex. G; Declaration of Marvin A. Miller Filed on Behalf of Miller Law LLC in Support of Application for Award of Attorneys' Fees and Expenses ("Miller Decl."), Ex. C, filed herewith.

Settlement is in the best interest of the Class after weighing the substantial benefits of the Settlement against the numerous obstacles to a better recovery after continued litigation. Accordingly, Lead Counsel submits that this factor also supports approval of the Settlement.

### 5. The Stage of the Proceedings and Amount of Discovery Completed

70. The sixth factor, the stage of the proceedings and the amount of discovery completed, fully supports the Settlement. The Action was filed in 2010 and the parties were deeply entrenched in active litigation for several years. Lead Counsel drafted a robust Amended Complaint, successfully opposed the complex motion to dismiss and petition for interlocutory appeal filed by Defendants, reviewed thousands of key documents related to Defendants' scienter and the falsity of their Class Period statements, briefed Lead Plaintiff's motion for class certification and engaged in robust price impact briefing and discovery, consulted with experts to evaluate the strength and weaknesses of Lead Plaintiff's claims, and completed substantially all fact and expert discovery. In addition, National Elevator remained actively involved in the litigation by, among other things, reviewing quarterly case updates, participating in strategy discussions, producing documents, sitting for deposition, and attending mediation. For all of these reasons, Lead Counsel submits that this factor militates in favor of the Settlement.

71. In light of the risks of establishing liability and damages and the additional risks of collecting a judgment, even if Lead Plaintiff prevailed, Lead Counsel and Lead Plaintiff respectfully submit that the Settlement represents a favorable result for the Class. It provides Class Members with a substantial benefit now, rather than a potential recovery after several more years of continued litigation – and the distinct possibility of no recovery at all.

- 23 -

### C. Mailing and Publication of Notice of Settlement

72. The Court's Preliminary Approval Order entered on September 18, 2015 directed Lead Counsel to cause the mailing of the Notice and the Proof of Claim and Release form to all potential Class Members identifiable with reasonable effort. Dkt. No. 293. The same was to be posted on the Settlement website at www.baxtersecuritiessettlement.com.

73. The Preliminary Approval Order also directed Lead Counsel to cause the Summary Notice to be published in the national edition of *Investor's Business Daily* as well as over the *PR Newswire*.

74. Approximately 392,700 Notices and Proof of Claim and Release forms have been mailed to potential Class Members and nominees beginning on October 9, 2015, and the Summary Notice was published in the national edition of *Investor's Business Daily* and transmitted over the *PR Newswire* on October 15, 2015, in compliance with the provisions of the Preliminary Approval Order. *See* accompanying Declaration of Carole K. Sylvester ("Sylvester Decl.") of Gilardi & Co. LLC.

## IV. THE PLAN OF ALLOCATION

75. The Plan of Allocation calls for the Net Settlement Fund to be distributed to Class Members who submit valid, timely Proof of Claim and Release forms ("Authorized Claimants") under the Plan of Allocation, which was fully set forth in the Notice distributed to potential Class Members pursuant to the Preliminary Approval Order. The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if that Class Member has a net loss on all transactions in Baxter common stock, after all profits from transactions in Baxter common stock during the Class Period are taken into account. In the event a Class Member has more than one purchase, acquisition or sale of Baxter common stock during the Class Period, all purchases, acquisitions and sales within the Class Period shall be matched on a

First-In, First-Out ("FIFO") basis. Under the FIFO method, sales of Baxter common stock during the Class Period will be matched, in chronological order, first against Baxter common stock held at the beginning of the Class Period. The remaining sales of Baxter common stock during the Class Period will then be matched, in chronological order, against Baxter common stock purchased or acquired during the Class Period.

76. The Plan of Allocation was prepared in consultation with the Claims Administrator. The purpose of the plan is to estimate the impact of the alleged misrepresentations on the price of Baxter common stock during the Class Period, and the plan reflects an assessment of the damages that could have been recovered as well as Lead Plaintiff's assessment of the likelihood of establishing liability. The Plan of Allocation was given considerable thought and attention to assure that the Settlement proceeds would be fairly and equitably distributed based upon the reasonable amount of inflation in the prices of Baxter common stock during the Class Period that was attributable to the alleged wrongdoing.

77. The plan provides for the calculation of each claimant's "Recognized Claim," which will be calculated for each purchase or acquisition of Baxter common stock, and for which adequate documentation is provided. The calculation of the Recognized Claim will depend upon when the stock was purchased or acquired, and whether it was held until the conclusion of the Class Period or, if not, when it was sold.

78. The Plan of Allocation provides that each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. No distribution will be made to Class Members who would otherwise receive a distribution of less than $10.00.

79.     If any funds remain in the Net Settlement Fund by reason of un-cashed distribution checks or otherwise, then, after the Claims Administrator has made reasonable and diligent efforts to have Class Members who are entitled to participate in the distribution of the Net Settlement Fund cash their distributions, any balance remaining in the Net Settlement Fund six months after the initial distribution of such funds shall be used, if feasible, to make a second distribution to claimants who cashed their checks from the initial distribution and who would receive at least $10.00, after payment of the estimated costs or fees to be incurred in administering the Net Settlement Fund and in making this second distribution.  If after six months after such re-distribution any funds shall remain in the Net Settlement Fund, then such balance shall be distributed to a non-profit organization designated by Lead Counsel and approved by the Court.

80.     The Notice informed Class Members that the Court will oversee the claims administration process and that they can write to the Court in the event they are unsatisfied with application of the Plan of Allocation by the Claims Administrator.

81.     To date, no written objections have been filed by any potential Class Member to the Plan of Allocation.

## V.     ATTORNEYS' FEES AND EXPENSES

82.     Lead Counsel seeks an award of attorneys' fees of 26% of the Settlement Fund.  This percentage is consistent with common fund case awards in this Circuit and well within the range of, and consistent with, the percentages of the common fund fees awarded to counsel in other securities class actions.  Based on the quality of Lead Counsel's work and the benefit obtained for Class Members in light of the risks discussed above, the requested fee is reasonable.

83.     The Seventh Circuit has held that in exercising their discretion in awarding fees, district courts should consider the following criteria: (i) awards made by courts in other class actions; (ii) the quality of legal services rendered; and (iii) the contingent nature of the case. *Taubenfeld v.*

- 26 -

*Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005). An analysis of these criteria demonstrates that the requested fee is fair and reasonable.

84.     With respect to the first factor, Lead Counsel's request for fees representing 26% of the Settlement Fund is consistent with those awarded by district courts within the Seventh Circuit in securities class action settlements. Thus, this factor supports that Lead Counsel's fee request is fair and reasonable.

85.     The quality of the legal services rendered also supports Lead Counsel's fee and expense request. Lead Counsel has national standing and is among the most experienced securities lawyers in the country. *See* Robbins Geller Decl., Ex. G. Few lawyers have the experience, professionalism, and knowledge to develop a successful litigation plan, and negotiate a substantial settlement in a case such as this. Defendants are represented by an outstanding law firm and attorneys at Skadden, Arps, Slate, Meagher & Flom LLP. In the face of opposition of this caliber, Lead Counsel developed this case so as to persuade Defendants to settle the Action on a basis favorable to the Class.

86.     Indeed, Lead Counsel has worked extremely hard to develop this case. Lead Counsel conducted the litigation in a coordinated and well-organized fashion to ensure maximum efficiency, and devoted both substantial attorney resources and financial resources to the case. Lead Counsel was preparing this case for summary judgment and then trial, and as a result, in the time it litigated the case, accumulated a lodestar of $16,475,718.00,[6] which is extremely reasonable in light of the length and complexity of this litigation. Indeed, awarding Lead Counsel a fee of 26% of the Settlement Fund, or $11,050,000, will result in a negative multiplier on their lodestar. This

---

[6]     This amount includes both Lead and Liaison Counsel's lodestar.

multiplier is considerably smaller than those permitted in similar cases. Accordingly, the quality of legal services rendered by Lead Counsel further supports approval of its fee and expense request.

87. The contingent nature of the case also supports Lead Counsel's fee and expense request. Courts have long recognized that the attorneys' contingent fee risk is an important factor in determining the fee award. As discussed above, Lead Counsel faced significant risks in pursuing this Action although there was no assurance of a recovery. Compounding the risk, Lead Counsel's fees are totally contingent and dependent upon a successful result and an award by this Court. From the outset, Lead Counsel understood that it was embarking on complex, expensive, challenging, and lengthy litigation (with no guarantee of compensation for the investment of time, money, and effort the case would require). In undertaking that responsibility, Lead Counsel was obligated to assure that sufficient resources of attorneys were dedicated to the prosecution of the Action and that funds were available to compensate staff and the considerable expenses a case such as this entails.

88. When Lead Counsel undertook to represent Lead Plaintiff and the Class in this matter, it was with the knowledge that it would spend many hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for its efforts. Lead Counsel was aware that the only way it would be compensated was to achieve a successful result. In light of the extraordinary level of risk undertaken, Lead Counsel's fee and expense request is fair and reasonable.

89. This Court will also find that public policy considerations support the requested fee award. Lead Counsel shouldered all of the risk of committing substantial resources to the litigation of this Action, and of working long hours in a heavily contested matter, notwithstanding significant uncertainty as to whether the Action would ultimately succeed. In addition, this Settlement spares

the parties, the Court, and other litigants waiting their turn before overburdened courts the burden of continued litigation and trial.

## VI.   CONCLUSION

90.   For the reasons set forth above and in the accompanying Lead Plaintiff's Memorandum of Points and Authorities in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds; and Lead Counsel's Memorandum of Points and Authorities in Support of Motion for an Award of Attorneys' Fees and Expenses, we respectfully submit that: (i) the Settlement is fair, reasonable, and adequate, and should be approved; (ii) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should also be approved; and (iii) the application for attorneys' fees and expenses should be granted.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 4, 2015, at Boca Raton, Florida.

s/ Robert J. Robbins
_____
ROBERT J. ROBBINS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

/s/ Robert J. Robbins
ROBERT J. ROBBINS

## Mailing Information for a Case 1:10-cv-06016 City of Lakeland Employees Pension Plan v. Baxter International Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Janine D Arno**
  jarno@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Spencer A Burkholz**
  spenceb@rgrdlaw.com

- **Kathleen Barber Douglas**
  kdouglas@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,ajewell@millerlawllc.com,drobinson@millerlawllc.com,JRamirez@millerlawllc.com

- **Jason Adeeb Forge**
  jforge@rgrdlaw.com,E_File_SD@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Michael Jerry Freed**
  mfreed@fklmlaw.com,mkhamoo@fklmlaw.com

- **Andrew J Fuchs**
  afuchs@skadden.com,chdocket@skadden.com

- **Jonah Harry Goldstein**
  jonahg@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew Thomas Heffner**
  mheffner@heffnerhurst.com,mhurst@heffnerhurst.com

- **Bailie Heikkinen**
  bheikkinen@rgrdlaw.com

- **Steven A Kanner**
  skanner@fklmlaw.com

- **Holly Wiseberg Kimmel**
  hkimmel@rgrdlaw.com

- **Matthew Robert Kipp**
  mkipp@skadden.com,chdocket@skadden.com

- **Leigh R. Lasky**
  lasky@laskyrifkind.com

- **Jeffrey D. Light**
  jeffl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Donna L. McDevitt**
  dmcdevit@skadden.com,chdocket@skadden.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,drobinson@millerlawlllc.com,JRamirez@millerlawllc.com

- **Amelia Susan Newton**
  amy@attorneyzim.com

- **Norman Rifkind**
  Norman@rifslaw.com

- **Robert J. Robbins**
  rrobbins@rgrdlaw.com,e_file_sd@rgrdlaw.com,cthornton@rgrdlaw.com,hkimmel@rgrdlaw.com,e_file_fl@rgrdlaw.com,ckent@rgrdlaw.com

- **Donald Lewis Sawyer**
  dsawyer@fklmlaw.com,mkhamoo@fklmlaw.com

- **Judith S. Scolnick**
  jscolnick@scott-scott.com,mschwartz@scott-scott.com,efile@scott-scott.com,aslaughter@scott-scott.com

- **Martin Vincent Sinclair**
  martin.sinclair@skadden.com

- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)